## QUIN v. EARLE.

(Circuit Court, E. D. Pennsylvania. August 9, 1899.)

### No. 8.

1. BANKS—INSOLVENCY—RECOVERY OF DEPOSIT FROM RECEIVER.

To authorize the recovery of a general deposit from the receiver of an insolvent bank on the ground that the bank was insolvent, and known to be so by its officers, when the deposit was received, and that the fraud authorized a rescission of the contract by the depositor, the thing deposited, or its proceeds, must be capable of identification in the hands of the receiver, or it must appear that the funds coming into his hands were increased by that amount.

2. SAME—PROOF OF FRAUD IN RECEIVING DEPOSIT—KNOWLEDGE OF INSOLVENCY BY OFFICERS.

To constitute fraud on the part of a bank in receiving a deposit when insolvent, which will authorize a rescission by the depositor, and a recovery of the deposit from a receiver subsequently appointed for the bank, the officers of the bank must have known or believed that it was insolvent at the time the deposit was received; and such knowledge cannot be presumed, but must be proved. The mere fact that the bank was known by the officers to be in an embarrassed condition is not sufficient to establish fraud.

This was a suit in equity against the receiver of an insolvent national bank to recover the amount of a deposit alleged to have been fraudulently received by the officers of the bank with knowledge of its insolvency.

E. Hunn Hanson, for complainant.

Asa W. Waters and W. H. Addicks, for respondent.

GRAY, Circuit Judge. This suit was brought to recover $3,000, with interest from February 16, 1898 (date of demand from receiver), on the ground that when deposited by the complainant, on the 22d of December, 1897, it was such a fraud on the part of the bank to receive it that it did not become the property of the bank, nor was the relation of debtor and creditor between it and the complainant created. The bill was filed March 23, 1898, and alleges: (1) That pursuant to the national banking act of June 3, 1864, and of its supplements, there was incorporated and organized the Chestnut Street National Bank on June 14, 1887, which from that time until December 22, 1897, conducted its business in the building No. 721 Chestnut street, Philadelphia. That for more than eight years the complainant was a depositor in the bank, and that from January 13, 1891, to his death, February 27, 1898, William M. Singerly was its president, and exercised supervision over its business. (2) That on December 22, 1897, and for some days prior, the bank was hopelessly insolvent, in a great measure brought about by the irregular dealings of its president, and on December 22, 1897, it was unable to continue business a day longer. This was known to its president, who on the date last aforesaid was in the bank building, and knew its business was so conducted that it represented solvency. That the complainant was ignorant of this insolvent condition, and was not informed

by the president and officers, and, had he not been in such ignorance, he would not have made the deposit hereafter mentioned. (3) That on December 22, 1897, and within less than an hour prior to 3 o'clock (the hour when the bank habitually ceased business each day), the complainant, upon the faith of the continuance of its ordinary business, and in ignorance of its insolvent condition, deposited with the receiving teller of the bank a check drawn upon the Fidelity Insurance, Trust & Safe-Deposit Company, requiring it to pay $3,000 to the order of complainant, who at the time of deposit indorsed it in blank. That the receiving teller entered the sum of $3,000 as a credit to the complainant upon his bank deposit book, and forthwith sent the check to the Fidelity Insurance, Trust & Safe-Deposit Company for payment. Payment in money was not made, but the said company delivered to the messenger of the bank a check for $3,000 drawn by it upon the Bank of North America, and received and canceled the check which the complainant had deposited. On the morning of December 23, 1897, the Bank of North America paid its check to the Chestnut Street National Bank. (4) That at 3 o'clock on December 22, 1897, the Chestnut Street National Bank closed its doors, and never thereafter opened them for business. That on the morning of December 23, 1897, William M. Hardt, as bank examiner, took into his charge the property of the bank, and so retained control until G. H. Earle, Jr., the defendant, was appointed receiver, in January, 1898, when the said property was transferred to him by the bank examiner. That of the property which so came into the charge of the bank examiner was the said sum of $3,000, and this he transferred to the receiver, in whose control it now is. (5) That on December 23, 1897, the complainant notified the cashier of the bank not to mingle the said sum of $3,000 with the moneys of the bank, but to set it apart to answer his demand for its return. That on December 30, 1897, the complainant caused a notice in writing to be served upon the bank examiner, to keep the said sum of $3,000 to answer his demand for its return as a specific sum belonging to him. And on February 18, 1898, the complainant sent to the receiver a copy of the said notice to the bank examiner, and subsequently demanded the sum of $3,000 from the defendant. (6) That the circuit court above entitled has jurisdiction of the suit begun by the complainant. That the consequence of the course of the bank, its president and officers, was to deceive, and it did deceive, the complainant, with respect to its hopeless insolvency, and by reason of the matter alleged the complainant is entitled to have the said $3,000, and that he has no adequate remedy at law. The bill prays that the court make a decree that, by reason of the fraud of the bank, the complainant's deposit of $3,000 did not create between him and it the relation of debtor and creditor; that the bank, with respect to the said $3,000, became under equitable obligation to pay it to him without any deduction, and the defendant with notice is under like obligation; that none of the creditors of the bank are entitled to have the defendant treat the sum of $3,000 as its assets; and that defendant pay complainant the sum of $3,000. The defenses set up in the answer, which admits most or many of the allegations in the stating part of

the bill, are: (1) A denial of the insolvency alleged.    (2) An allegation that the president and officers of the bank on the 22d of December, 1897, had good reason for confidence in its solvency.    (3) An allegation that when, some time prior to 3 o'clock of December 22,· 1897, the complainant made a deposit in the bank, and was credited in his pass book with the sum of $3,000, the total credit to his account was $3,248.28, all of which was subject to his check at any time during the business hours of that day, and that it was. the custom of Philadelphia banks to collect on the day they received drafts and checks upon trust companies, and the bank was only complying with such custom in collecting the $3,000 check on the day it was deposited.    (4) A denial that the $3,000 deposited by the complainant ever came specifically into the defendant's possession, or that it is now, or ever has been, in his custody, as alleged.    (5) That complainant had an open running account with the bank, and that before 3 o'clock on December 22, 1897, the balance due him therein was $3,248.28, which included the $3,000 item mentioned in complainant's bill; that the bank was debtor in the amount of this balance to the complainant, and for which he has a just and proper claim for his pro rata share in the assets of the bank, provided it is duly proven.    The admitted facts seem to be that complainant made the deposit substantially as stated in his bill of complaint; that he received credit for the same in his pass book, as well as upon the books of the bank; that the check, which was to the order of complainant, and upon the Fidelity Trust Company, was sent by the bank for collection within a half hour of its receipt, and before 3 o'clock, and that the Fidelity Insurance, Trust & Safe-Deposit Company delivered to the messenger of the bank a check for $3,000, drawn by it on the Bank of North America, in payment of the same, and that on the morning of December 23d the Chestnut Street National Bank sent the last-named check to the Bank of North America, which paid the said check to the Chestnut Street National Bank through the clearing house; that the Chestnut Street National Bank at the time of said deposit was in a state of financial embarrassment, owing largely, if not altogether, to an indebtedness of some $800,000 due it from its president, William M. Singerly; that the bank, within a half hour after the said deposit by complainant, to wit, at 3 o'clock in the afternoon (the usual hour for closing) on the 22d of December, 1897, closed its doors; that the bank was never opened again; and that on the next day, the 23d of December, it was taken possession of by Bank Examiner ·Hardt.

The principle of equity invoked by the complainant's bill is that where a bank, whose officers know it to be hopelessly insolvent, receives moneys or checks on deposit on the very eve of its failure, it commits such a fraud on the depositor, who is ignorant of its condition, that he is entitled to reclaim the moneys or proceeds of checks. This proposition, thus stated, must be assented to.    It is a development of the doctrine that a contract founded on fraud is void, and may be rescinded at the option of the defrauded party, and cannot be enforced against him, that no title to property so obtained passes, and that restoration of the property obtained by means of the fraud, if properly identified, can be compelled by appropriate proceedings

in law or in equity. Considering the usage of business of the banks, when a general deposit is accepted by a bank there is an implied contract between the depositor and depositary, which creates the relation of creditor and debtor between them. A fraud on the part of the bank which induces the deposit vitiates this contract, at the option of the other party, as fraud would vitiate any other contract, and no rights can arise out of it to the bank. What the remedy may be will depend in this case, as in others, upon the situation of the parties and the subject-matter of the contract. Upon a rescission of the contract, and due notice thereof, the check or draft deposited, or the proceeds thereof, if sufficiently identified, may be reclaimed, if in the possession of the depositary. With regard to personal property other than money, the question of identification is generally easy of determination. Not so of money, and perhaps some personal property other than money. If these be confused in the mass of exactly similar things, specific identification becomes impossible. But the more modern doctrine has come to be that, where the fraudulent depositary so mingles goods which he has obtained by fraud with the mass of like goods of his own, the whole may be seized, or considered as held in trust, until equitable separation of the property of the defrauded party is made. So, advancing one step further, where money thus obtained has gone to swell the aggregate in the possession of the fraudulent party, it may, under proper proceedings, be segregated in amount from such aggregate sum, and made the subject of a trust, in order to accomplish the ends of justice. If my bushel of corn be obtained from me by fraud, and be poured into the mass of similar grain in the bin of the party committing the fraud, justice is satisfied, and no one can be wronged, by my having restored to me a bushel of the same grain out of the bin, though the identical grains obtained from me are not restored. If, on the other hand, the funds in possession of the defrauding bank be not increased by the property or the money so obtained, so that the aggregate amount of assets for distribution among the general creditors is not made larger by reason of the plaintiff's contribution thereto, then this extension of the doctrine of identification will not apply, and the complainant cannot have remedy as for a preferred claim. All the cases referred to by the counsel for complainant are consistent with this distinction, and the case of Bank v. Blackmore, 21 C. C. A. 514, 75 Fed. 771, distinctly elaborates the doctrine just stated; Judge Taft, who delivered the opinion of the court, saying:

"No authority has been cited to show that a claim founded on fraud is entitled to a priority over other claims. It is only where, by the rescission of the contract out of which the claim arises, on the ground of fraud, the specific thing parted with, or its proceeds, can be sufficiently identified to be returned, that fraud seems to give a priority of distribution. It may not be necessary to show earmarks upon the proceeds of the thing parted with, to justify such a remedy; but it must at least appear that the funds in the hands of the receiver were increased or benefited by the proceeds, and the recovery is limited to the extent of this increase or benefit. In every case relied on by counsel for appellant, recovery, if decreed, was based on the fact that the property in the hands of the assignee or receiver of the person or bank against whom the claim of fraud, right to rescind, and priority of distribution was made, included in its mass either the very thing parted with, or its proceeds. Rail-

way Co. v. Johnston, 133 U. S. 573, 10 Sup. Ct. 390; Armstrong v. Bank, 148 U. S. 50, 13 Sup. Ct. 533; Cragie v. Hadley, 99 N. Y. 131, 1 N. E. 537."

I have dwelt upon this, because the contention is made by the counsel for the defendant that the evidence discloses the fact that in some way the check on the Bank of North America received from the Fidelity Company by the Chestnut Street National Bank in payment of the check deposited by complainant was settled through the clearing house in such manner that no proceeds from it ever came into the possession of the defaulting bank,—the same having been set off against an indebtedness of said bank,—and that, therefore, there could be nothing analogous to an identification of the check or its proceeds by reason of their having been found in the mass of funds or assets in the receiver's hands, thus swelling the amount to be distributed. But, however this may be, it will not be necessary to consider it, in the view taken of the material question of fact as to which issue is joined, and upon which the case undoubtedly turns. That question is whether, at the time the deposit of the complainant was received by the Chestnut Street National Bank, said bank was hopelessly and irretrievably insolvent, and that fact was known to the officers of the bank,—notably, the president. This is affirmed by the complainant in his bill, and denied by the defendant in his answer. Upon this issue of fact this case must be determined. In none of the cases cited by the complainant does this issue seem to have been raised. In the case of Railway Co. v. Johnston, 133 U. S. 566, 10 Sup. Ct. 390, the hopeless insolvency of the Marine Bank seems to have been assumed in the opinion of the supreme court, as also the knowledge of the president of the bank of that fact. And in Wasson v. Hawkins, 59 Fed. 233, the case came up upon a demurrer to the bill of complaint, which contained allegations of the hopeless and irretrievable insolvency of the bank, and of the knowledge of its president of that fact. For the purposes of the demurrer, these allegations, of course, were taken to be true. So, also, in the case of City of Somerville v. Beal, 49 Fed. 790, the case was heard on demurrer to the bill of complaint, and the same allegations contained in it were assumed to be true. The law applicable to the facts thus ascertained is well settled, and is not disputed in this case. If the president and officers of the bank knew or believed that the bank was hopelessly and irretrievably insolvent at the time of receiving the deposit of the complainant, then a fraud was undoubtedly committed by the bank upon the complainant, for which there should be a remedy. But fraud must be proved, and is not to be presumed, and the burden of proof is on the complainant. The mere fact that the bank was in an embarrassed condition, by reason of the large indebtedness to it from its president, is not sufficient of itself to establish the fraud alleged in this case. A trader, whether a corporation or an individual, may be struggling in the straits of financial embarrassment, but with an honest hope of weathering the financial storm and of being eventually solvent. Property received by such an individual or concern in the ordinary course of business during the period of such embarrassment becomes honestly theirs, and the fact that their expectations were unrealized, and their hopes not well founded,

would not fasten upon them a fraud that would vitiate their business transactions. The most important evidence in this case as to the facts upon which the allegation of fraud is founded is given by Mr. Stotesbury, a member of the firm of Drexel & Co., and introduced by the complainant. This evidence, I think, is fairly summarized by defendant's counsel as follows: That on December 22, 1897, through the efforts of his firm, a plan had been devised for the reorganization of the Philadelphia Record Company, by which $643,000 out of a total indebtedness of $817,000 due by Mr. Singerly to the bank was to be paid in cash on the morning of December 23, 1897, and that, so confident was he of the success of the plan, that his firm advanced $125,-000 to the bank on the 21st or 22d of December, in cash, to carry it through the clearing house on the morning of December 23, 1897, when it was expected this payment of $643,000 would come to the bank as a payment from Mr. Singerly, and to carry the bank over December 22d, when a committee, on the evening of that day, were to examine the trust company's books. Mr. Stotesbury admitted that the payment of the indebtedness of Mr. Singerly to the bank would make the bank solvent. William C. Smith, receiving teller of the bank, introduced by the complainant, testified on cross-examination, on page 20 of the examination of December 2, 1898, as follows:

"Q. Did Mr. Singerly say to you anything on the day before the suspension as to there being any doubt as to its [the bank's] opening the next day? A. During the day before the bank closed, I had every assurance that the bank would be in funds to meet all demands. Q. Who gave you that assurance? A. The cashier. Q. Mr. Steele? A. Cashier William Steele. Q. Did he state the grounds for this assurance? A. He said that the terms had been agreed to by the syndicate to take up Mr. Singerly's liabilities, and furnish cash to enable the bank to go on. Q. How late in the day of the 22d did you have these assurances from the cashier? A. Well, before 3 o'clock. I think, again after 3 o'clock."

The committee to examine the books of the trust company met on the evening of the 22d, and the result of their examination was such as to cause them to advise the syndicate against going on with the negotiations. They so informed Mr. Singerly, who was present. This was between 10 and 11 o'clock of the evening of December 22d. Mr. Singerly then turned to Mr. Hardt, the bank examiner, and said, "This means, Mr. Hardt, that you will have to take charge of the bank to-morrow morning." I cannot see in all this that Mr. Singerly, as president of the bank, was not, up to the hour named, making a bona fide and hopeful struggle to extricate the bank from its difficulties. That he, as men in such straits are apt to be, was over-sanguine, does not matter, if the hope really existed, on the grounds here disclosed, at the time the deposit was received. The evidence of Mr. Stotesbury certainly shows that Mr. Singerly had powerful friends, and that a syndicate of ample financial strength had been actually formed to put him in a position to relieve the bank of its embarrassment. I do not think that a fraudulent purpose in receiving the deposit of complainant should be necessarily attributed to him because he did not, under the circumstances, abandon hope of assistance from that source until 10 or 11 o'clock of the evening of that day. Nor do I think that there is any sufficient evidence that

he had so abandoned that hope at the time of receiving the deposit. To. have suspended the business of the bank, and refused deposits, pending the negotiations upon which his hopes were founded, would have destroyed all prospect of their success.

This testimony above referred to is substantially all that has been adduced by complainant on this subject. The testimony of William M. Hardt, bank examiner, a witness for the defendant, clearly supports the view that the situation on the afternoon of December 22d was a hopeful one. His testimony is to the effect that the payment of Mr. Singerley's indebtedness to the bank, of about $817,000, would make the bank absolutely solvent; that leading members of the Clearing House of Philadelphia, presidents of banks and trust companies, had on the 22d of December, 1897, subscribed to a plan, which was practically complete, which provided for the payment of $643,000 in cash to the bank on account of Mr. Singerley's indebtedness, to be paid on the morning of December 23, 1897; that the remainder of Mr. Singerley's indebtedness, to the extent of $175,000, was otherwise provided for; that the payment of this money to the bank in full for Mr. Singerly's indebtedness would make the bank's condition absolutely solvent; and that he and Mr. Singerly and the directors and other officers of the bank had every reason to believe, and did believe, that this plan would be carried out, and that the money would be forthcoming on the morning of December 23, 1897, until between 8 and 9 o'clock p. m. of the 22d of December, 1897, when an unlooked for and unexpected obstacle arose, which prevented the final execution of the plan. It appears clear, then, that the transaction of complainant, in the beginning, was free from any trust relationship such as existed in several of the cases cited, where the drafts were deposited with the defaulting bank specifically for collection, or with specific instructions to collect and remit, and that the title to the check and its proceeds in this case passed to the bank upon its deposit and its crediting on the pass book of complainant and on the books of the bank, unless that result of the contract between the complainant and the bank was prevented by the alleged fraud of the bank in receiving the deposit when it was hopelessly and irretrievably insolvent, and that to the knowledge of its president and other officers. It seems equally clear to the court that this material allegation of fraud has not been satisfactorily proved, and the issue of fact therein raised by the pleadings cannot, therefore, be determined in favor of the complainant. The bill must accordingly be dismissed, with costs to be taxed.