[No. 17589.   *En Banc.*   September 20, 1923.]

WASHINGTON SHOE MANUFACTURING COMPANY, *Respondent*, v. J. P. DUKE, *as State Supervisor of Banking, Appellant.*[1]

BANKS AND BANKING (26)—GENERAL OR SPECIAL DEPOSITS—AGREEMENT OF PARTIES—INTENT OF DEPOSITOR—EVIDENCE. Deposits received by a failing bank, on the last day before closing its doors, which were placed in separate envelopes marked with the depositors' names, with the intention on the part of the bank (not disclosed to the depositors) of returning the same to the depositors in case of insolvency and liquidation, are general and not special deposits, in the absence of any special agreement with the depositors or any intent on the part of the depositors to make special deposits.

SAME (6, 8)—INSOLVENCY—FRAUD—DEPOSITS AFTER INSOLVENCY—RIGHT OF RECOVERY—EVIDENCE—SUFFICIENCY. Deposits received by a failing bank, on the last day before closing its doors, which were placed in separate envelopes marked with the depositors' names, with the intention on the part of the bank (not disclosed to the depositors) of returning the same to the depositors in case of insolvency and liquidation, do not constitute trust funds that may be recovered by the depositors on the ground of fraud, as in the case of deposits accepted by a bank after knowledge of its hopeless and irretrievable insolvency, where there was a present reasonable expectation that insolvency and liquidation would be avoided through a consolidation and the subscription of $2,000,000 therefor, $1,825,000 of which was actually subscribed (TOLMAN and FULLERTON, JJ., dissenting).

Appeal from a judgment of the superior court for King county, Neal, J., entered September 23, 1922, in favor of the plaintiff, in an action to recover a deposit in an insolvent bank, tried to the court.   Reversed.

*W. V. Tanner* and *John P. Garvin,* for appellant.

*G. E. Steiner* and *Carkeek, McDonald, Harris & Coryell,* for respondent.

MAIN, C. J.—The plaintiff brought this action to recover a deposit made in the Scandinavian American

[1]Reported in 218 Pac. 232.

Bank of Seattle, on June 30, 1921, the last day on which the bank was open for business, or, in lieu thereof, to have the assets of the bank impressed with a trust in a sum equal to the amount of the deposits on that day. The cause was tried to the court without a jury, and resulted in a judgment sustaining the plaintiff's right to recover. From this judgment, the defendant appeals.

The respondent is a corporation organized and existing under the laws of this state. The appellant is the state supervisor of banking and is in possession of the assets of the Scandinavian American Bank, which for many years prior to its closing was engaged in the banking business in Seattle. The bank was turned over to the appellant on the morning of July 1, 1921, and since that time has been in the process of liquidation. For some time prior to the closing of the bank, there had been a steady loss of profits. During the eighteen months immediately preceding, there had been a loss of deposits in approximately the sum of $700,000 per month. After January 15, 1921, when a bank of the same name, doing business in the city of Tacoma, failed, the withdrawal of deposits from the Seattle bank was accentuated. From that date until the time the Seattle bank was turned over to the appellant, there were withdrawals aggregating approximately three and one-half million dollars. In order to provide funds to meet these withdrawals, an attempt was made to liquidate the assets of the bank, which included quite an amount of slow paper.

About two weeks prior to the closing of the bank, the consideration of its condition was taken up with some of the other banks of Seattle through the clearing house with a view to consolidating the Scandinavian American Bank with other banks and continuing business in

that way. As a result of these negotiations, there was evolved a plan of forming a consolidated bank consisting of the Scandinavian American Bank and three others; and, for the purpose of guaranteeing the members of the consolidation against loss and aiding the slow and doubtful assets of the Scandinavian American Bank, it was planned to raise among the banks of the state and others a fund of two million dollars in cash. This plan met with such success that, on the morning of June 30, 1921, there had been raised among the banks in Seattle and the banks of the state approximately $1,825,000. The conferences looking to the plan of re-organization were participated in by the president of the Scandinavian American Bank, officers representing the other banks concerned, members of the clearing house of Seattle, and the supervisor of banking of this state. The testimony is undisputed that there was every expectation of the success of the plan during the day of June 30 and until about 11 or 12 o'clock on the night of that day, when, the entire subscription of $2,000,000 not having been obtained, the plan for the merger failed.

Rumors of the proposed consolidation and condition of the bank had gained such circulation in the city of Seattle during the few days prior to June 30 that it was feared by those in charge of the bank that a run upon it would result. The bank was then in that condition that, if there were further heavy withdrawals of deposits, it would in a short time be unable to pay upon demand. The officers of the bank, on the morning of June 30, realizing this state of affairs and having in mind the possibility of the failure of the consolidation plan, instructed the tellers of the bank to keep entirely separate all deposits offered on that day by putting the money of each depositor in a separate envelope and

marking the name of the depositor on the outside thereof. The reason for this was that it was the hope of the officers that, if the consolidation plan failed, the deposits received on this day would be returned to those who made them, if, under the law, they should be entitled thereto.

During the 30th, many deposits were made, one of the depositors being the respondent. So far as the depositors were concerned, the deposits were made in the usual way, the entry being made in the depositor's pass-book, or a duplicate deposit slip being issued in the absence of the book. When the money and checks were passed to the tellers, each depositor's money and checks were placed in an envelope and his name placed on the outside. No entries were made on the books of the bank. The depositors had no knowledge of the manner in which the deposits were handled after they were passed to the tellers. These deposits, together with the other assets of the bank, came into the possession of the supervisor of banking on the morning of July 1, when that officer took possession. Thereafter the envelopes were opened and the entries made upon the books of the bank.

As above stated, at about 11 o'clock on the night of June 30, the last day on which the bank was open for business, the negotiations leading to the consolidation were abandoned, and soon thereafter and during the same night, the trustees of the Scandinavian American Bank passed a resolution to turn the bank over to the supervisor of banking on the following morning.

The respondent claims that it had a right to recover the deposit made on June 30, which was placed in the envelope, as above indicated, or, in lieu thereof, have the assets of the bank impressed with the trust in the amount of such deposit. If the respondent has a right

to prevail, it is because the deposit was a special one and not a general deposit. As is well understood, a deposit in a bank is either general or special. Where a general deposit is made, the title thereto passes to the bank and the latter becomes the debtor of the depositor. When the bank accepts a special deposit, it becomes a trustee of the depositor and holds the money subject to the trust. *Carlson v. Kies,* 75 Wash. 171, 134 Pac. 808, 47 L. R. A. (N. S.) 317; *Kies v. Wilkinson,* 101 Wash. 340, 172 Pac. 351. In the second case cited, the rule and the exceptions thereto are stated as follows:

"As a rule, when money is deposited in a bank, title to it passes to the bank. The bank becomes the debtor of the depositor to the extent of the deposit, and to that extent the depositor becomes the creditor of the bank. *Allibone v. Ames,* 9 S. D. 74, 68 N. W. 165, 33 L. R. A. 585. Such deposit then constitutes a part of the assets of the bank and, in case of insolvency, belongs to the creditors of the bank in proportion to the amounts of their respective claims. Exceptions to this rule are: First, where money or other thing is deposited with the understanding that that particular money or thing is to be returned to the depositor; second, where the money or thing deposited is to be used for a specifically designated purpose; and third, where the deposit itself was wrongful or unlawful."

The rule is that a deposit will be deemed general unless it is made special by contract, and in the absence of an agreement to the contrary, it will be presumed to be a general deposit and not special. *Bank of Blackwell v. Dean,* 9 Okl. 626; *Schofield Manufacturing Co. v. Cochran,* 119 Ga. 901; *Town of Manitou v. First National Bank of Colorado Springs,* 37 Colo. 344, 86 Pac. 75; *Dawson v. Real Estate Bank,* 5 Ark. 283; *Nichols v. State,* 46 Neb. 715, 65 N. W. 774.

In the case last cited it is said:

"Whether the deposit was a general or special one was of course a question of fact to be determined from the intention of the parties, but a deposit is presumed to be a general one in the absence of evidence to the contrary."

The question then arises whether the deposit made by the respondent, which is presumed to be general and which could only be made special by the intention or agreement between the bank and the depositor, was made special by reason of the fact that the bank did not intend to receive it as a general deposit, unless the plan of consolidation should be consummated. In other words, did the intention of the bank, not disclosed to the respondent, the depositor, to accept the deposit as special make it such? The rule is that a deposit is not special unless made so by the depositor. In 7 C. J. 630, it is said:

"Whether a particular deposit is general or special is a matter to be determined by the facts and circumstances attending the making of the deposit, and the rule is that a deposit is not special unless made so by the depositor or unless made in a particular capacity."

In *Boettcher v. Colorado Nat. Bank,* 15 Colo. 16, 24 Pac. 582, it is said:

"A deposit is not special unless made so by agreement or directions of the depositor, or by such circumstances as being inclosed in a box, or other matter indicative of intent not to make a general deposit, or unless made in a particular capacity which indicates such intent."

In *Meadowcroft v. People,* 163 Ill. 56, 45 N. E. 991, it is said:

"Besides this, a deposit of money with bankers at their banking house is regarded as general, unless it

appears that the depositor makes it special or deposits it expressly in some particular capacity.''

In *People v. California Safe Deposit & Trust Co.,* 23 Cal. App. 199, 137 Pac. 1111, 1115, it is said:

''Whether a deposit is general or special depends, of course, upon the intention of the parties. A deposit will, however, always be deemed to be general, *unless made special by agreement.* Something more than the intent of one party to the deposit is necessary—the intent of both parties must be shown to concur either expressly or by implication.''

It appears, therefore, to be the settled law that a deposit is general unless made special by the agreement of the parties, and that, in the absence of facts or circumstances showing that it was the intention of the depositor to make it special, the deposit will be deemed general.

In the case now before us there are no facts or circumstances which would indicate that the depositor intended to do other than make a general deposit. It is true that, at the time the deposit was made, the bank, through its officers and employees, entertained an intention, which was not disclosed to the depositor, to treat the deposit other than as a general one. This undisclosed intention cannot be made to determine the nature of the transaction. The apparent mutual assent of the parties, essential to the formation of a contract, must be gathered from their outward expressions and acts, and not from an unexpressed intention. In 13 C. J. 265, it is said:

''The apparent mutual assent of the parties, essential to the formation of a contract, must be gathered from the language employed by them, and the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts. It judges of his intention by his outward expressions and ex-

cludes all questions in regard to his unexpressed intention. If his words or acts, judged by a reasonable standard, manifest an intention to agree in regard to the matter in question, that agreement is established, and it is immaterial what may be the real but unexpressed state of his mind on the subject.''

This text but states the general rule supported by the authorities, which need not here be assembled.

Attention will now be given to the authorities cited by the respondent to sustain its position that the deposit was special and not general. In *Sively v. State,* 107 Miss. 118, 65 South. 118, the cashier of a bank, pending a decision of the board of directors to liquidate it because of its financial condition, received all deposits offered, but kept the funds separate from the funds of the bank by pinning the money to the deposit slip and placing the same in a box. For two days prior to the time the bank closed, all deposits were received and kept in this way. Afterwards they were all returned to the depositors by the receiver of the bank, except one of $70, which it appears that the party entitled thereto did not get the notice sent to him to call for the same. Thereafter the cashier was indicted for receiving the deposit of $70 when he knew the bank was insolvent. That was a criminal case, and it was there held that the cashier of the bank was not guilty of a crime. The opinion is written upon the theory that the depositors had a right to the return of their money, though the question as to the legal effect of the deposit, as to whether it was general or special, does not receive much consideration. The court was of the opinion that, since intention was an essential element of the case, and there being no fact from which this could be inferred, there was not sufficient evidence to sustain the charge. It might well be held in a criminal case that an officer of an insolvent bank receiving

money of a depositor and taking such precautions to deal fairly with him in the event that the bank should close, would not be guilty of any crime, even though in law the deposit was general and not special.

In the case of *Fogg v. Tyler*, 109 Me. 109, 82 Atl. 1008, Ann. Cas. 1913E 41, 39 L. R. A. (N. S.) 847, it was held that, under the facts in that case, there was a mutual understanding that the deposit should be special, and therefore the case falls within the general rule above stated. In § 589, vol. II, Morse on Banks and Banking (5th ed.), which is entitled ''Insolvency of Depositary as a Ground for Recovery of Deposit,'' there are one or two sentences or expressions which lend support to the respondent's position. The only case cited in the notes, which sustains the position of the author, is that of *Chaffee v. Fort*, 2 Lans. (N. Y.) 81, but that case could well have been decided upon the theory that the bank was hopelessly and irretrievably insolvent, and that the acceptance of the deposit was a fraud upon the depositor. It was there said:

''Goldey did not design to defraud the plaintiff and others, who deposited with him after half-past twelve p. m. of the 8th, September, 1869. Knowing his insolvency and inability to continue business, he kept the plaintiff's deposit separate from his own funds, marked it with the plaintiff's name in order to identify it, with the intention of returning it to plaintiff, should he, Goldey, be unable to continue his business.''

The writer of the opinion assumes that the character of the deposit could be determined by the bank, even though undisclosed to the depositor, and this is out of harmony with the rule supported by the authorities, which appears from what has been hereinbefore said.

The case of *Hitt Fireworks Co. v. Scandinavian American Bank*, 114 Wash. 167, 195 Pac. 13, 196 Pac. 629, is cited as sustaining the respondent's position.

There it was held that the deposit was special, but this was because the depositor intended to make a special deposit, and the bank was charged with notice of such intention and acquiesced therein.

When the case now before us was reheard *En Banc,* the respondent filed a supplemental brief in which additional authorities were cited. One of those cases is where the deposit was made for a specific purpose and thereafter became a trust fund, and for that reason is distinguishable. Some of them are cases which hold that, when checks are deposited in a bank at a time when it is insolvent, and which are drawn upon another bank, and before they are paid the bank in which they are deposited fails, and when the checks are subsequently paid, they may be recovered by the depositor from the receiver of the bank. This is for the reason that the banks took the checks for collection and not as owner. The rule in this state is otherwise and is to the effect that the deposit of a check in a bank constitutes a sale of the paper and passes title thereto, subject only to the right of rescission if the paper is subsequently proved to be without value. This, of course, is in the absence of a special agreement to the contrary. *Vickers v. Machinery Warehouse & Sales Co.,* 111 Wash. 576, 191 Pac. 869; *Raynor v. Scandinavian American Bank,* 122 Wash. 150, 210 Pac. 499.

The class of cases referred to, as already stated, are from jurisdictions which hold that a check deposited in one bank but drawn upon another is taken by the first bank for collection and not as owner. The case of *In re Assignment of the Commercial Bank,* 13 Ohio Dec. 304, sustains the respondent's position, but that is a case decided by one of the circuit courts of the state of Ohio and, so far as we are informed, has not met with the approval of the appellate court of that state. It is

out of harmony with the law as we understand it and is not supported by sound reason. It follows that the respondent cannot recover on the theory that the deposit was a special one.

This brings us to the question as to whether, since the deposit was general, the depositor has a right to rescind the transaction and recover on the ground of fraud. Where a bank, whose officers know it to be hopelessly and irretrievably insolvent at the time, receives money or checks on deposit on the eve of its failure, a fraud is committed on the depositor who is ignorant of the condition of the bank, and he is, therefore, entitled to reclaim the moneys or the proceeds of the checks which he has deposited, or in lieu thereof have the assets of the bank impressed with a trust in the amount of such deposit. *Raynor v. Scandinavian American Bank, supra.*

This presents the question whether the Scandinavian American Bank of Seattle, on the 30th day of June, 1921, when it received the deposit in question from the respondent, was hopelessly and irretrievably insolvent. If it was, the transaction should be rescinded and the judgment of the trial court affirmed on this theory. If it was not, the judgment cannot be sustained, since, as already pointed out, the doctrine of a special deposit will not sustain it. The bank was not hopelessly and irretrievably insolvent, because on this day there was a reasonable hope and expectation on the part of the officers that the consolidation plan above mentioned would be consummated and that the business of the bank would be continued and its fortunes retrieved. This hope and expectation was justified by the facts, about which there is no dispute. Negotiations had been pending for about two weeks, with the knowledge and participation of the state supervisor of banking.

One million eight hundred twenty-five thousand dollars of the necessary $2,000,000 guarantee fund had been raised. It was the belief of the officers of the Scandinavian American Bank, as well as the others who participated in the negotiations, that the consolidation plan would be consummated on the night of June 30. The supervisor of banking, with reference to the probable success of the consolidation plan, testified:

"Q. During the time of those conferences did it appear that the plan was likely to succeed? A. Yes, sir. There was a great deal of prospect that the plan would succeed and be put over on the last day of June. As a matter of fact, for two days it just seemed as if the banks would be successful in completing the reorganization of the bank. Q. When was it realized that the plan had failed? A. At the adjournment of the Clearing House meeting, about between eleven and twelve o'clock at night on the 30th of June."

Under these circumstances, it cannot be said that, on that day, the bank was hopelessly and irretrievably insolvent, which it would be necessary to find before the respondent would have a right to rescind the deposit on the ground of fraud, and impress the assets of the bank with a trust.

In *Brennan v. Tillinghast*, 201 Fed. 609, it is said:

"However, the mere fact that the bank is known to be insolvent at the time the deposit is received is not in our opinion sufficient of itself, without more, to confer this right of rescission upon the depositor, and such right of rescission would not arise when the bank at the time of receiving the deposit, although embarrassed and insolvent, yet had reason to believe that by continuing in business it might retrieve its fortunes; the necessary condition upon which the right of rescission is predicated being that the deposit was received when the bank was hopelessly embarrassed and so circumstanced as to constitute its receipt of the deposit a fraud upon the depositor."

In *Steele v. Commissioner of Banks,* 240 Mass. 394, 134 N. E. 401, it is said:

"Acceptance of deposits by a bank is a representation of solvency. A bank hopelessly insolvent, receiving deposits from those who confide in its good reputation or in its representations, is held to knowledge that it cannot meet its obligations. Taking deposits under such circumstances is the equivalent of a preconceived purpose not to pay and is a fraudulent act. The contract of deposit may be rescinded by the depositor and the deposit, or its proceeds, if traced, may be recovered in like manner as other trust funds. On the other hand, simple insolvency, even of a bank, does not warrant the rescission of deposits if there are genuine and reasonable hope, expectation and intention on the part of the officers of the bank to carry on its business and to recover sound financial standing. To warrant such rescission there must be the further fact that it is reasonably apparent to its officers that the concern will presently be unable to meet its obligations as they are likely to mature and will be obliged to suspend its ordinary operation. The facts must establish the conclusion that the trust company accepted the deposit knowing through its officers that it would not and could not pay the money when demanded by the depositor."

While it does not appear that the supreme court of the United States has ever passed directly upon this question, it says in *St. Louis & S. F. R. Co. v. Johnston,* 133 U. S. 566, with reference thereto:

"Granted that the mere omission to disclose the insolvency, if there had been ground for the supposition that the bank might continue in business, would not be sufficient, there is nothing for such a belief to rest on here."

In *Quin v. Earle,* 95 Fed. 728, which is strikingly like the case now under consideration in its facts, it was said:

"The testimony of William M. Hardt, bank examiner, a witness for the defendant, clearly supports the

view that the situation on the afternoon of December 22d was a hopeful one. His testimony is to the effect that the payment of Mr. Singerley's indebtedness to the bank, of about $817,000, would make the bank absolutely solvent; that leading members of the Clearing House of Philadelphia, presidents of banks and trust companies, had on the 22d of December, 1897, subscribed to a plan, which was practically complete, which provided for the payment of $643,000 in cash to the bank on account of Mr. Singerley's indebtedness, to be paid on the morning of December 23, 1897; that the remainder of Mr. Singerley's indebtedness, to the extent of $175,000, was otherwise provided for; that the payment of this money to the bank in full for Mr. Singerley's indebtedness would make the bank's condition absolutely solvent; and that he and Mr. Singerley and the directors and other officers of the bank had every reason to believe, and did believe, that this plan would be carried out, and that the money would be forthcoming on the morning of December 23, 1897, until between 8 and 9 o'clock p. m. of the 22d of December, 1897, when an unlooked for and unexpected obstacle arose, which prevented the final execution of the plan. It appears clear, then, that the transaction of complainant, in the beginning, was free from any trust relationship such as existed in several of the cases cited, where the drafts were deposited with the defaulting bank specifically for collection, or with specific instructions to collect and remit, and that the title to the check and its proceeds in this case passed to the bank upon its deposit and its crediting on the pass book of complainant and on the books of the bank, unless that result of the contract between the complainant and the bank was prevented by the alleged fraud of the bank in receiving the deposit when it was hopelessly and irretrievably insolvent, and that to the knowledge of its president and other officers. It seems equally clear to the court that this material allegation of fraud has not been satisfactorily proved, and the issue of fact therein raised by the pleadings cannot, therefore, be determined in favor of the complainant.''

In a comprehensive note to the case of *Steele v. Commissioner of Banks, supra,* which is compiled in 20 A. L. R. 1203, it is said:

"And there is considerable authority to the effect that the mere fact that a bank, at the time it receives a deposit, is known by its officers to be insolvent, is not necessarily sufficient of itself, without more, to confer the right of recovery upon the depositor. Thus it has been held that the right of recovery does not arise when the bank, at the time of receiving the deposit, although embarrassed and insolvent, has, in the honest opinion of its officers, a reasonable chance to recover sound financial standing by continuing in business, since in such a case the acceptance of a deposit does not constitute a fraud upon the depositor."

The judgment will be reversed, and the cause remanded with directions to the superior court to dismiss the action.

PEMBERTON, BRIDGES, MACKINTOSH, and PARKER, JJ., concur.

TOLMAN, J. (dissenting)—I concur in that part of the opinion which holds the deposits to be general and not special, but I dissent from that part which holds that the bank was not so hopelessly insolvent as to permit the depositors to recover. The majority opinion says:

"The bank was not hopelessly and irretrievably insolvent because on this day there was a reasonable hope and expectation on the part of the officers that the consolidation plan above mentioned would be consummated, and that the business of the bank would be continued and its fortunes retrieved."

Not only so, but the president of the bank was called as a witness and explained the then conditions. From his testimony it clearly appears that the bank had, to meet insistent and growing demands, realized on its assets as far as possible, that it could not continue to

meet its obligations in the ordinary course of the banking business, and that it was morally certain that, if the consolidation plan was not. put into immediate effect, the bank would have to close.   Hence, under our rule, the bank was hopelessly and irretrievably insolvent, and by its officers known to be so.   The simple fact that there is hope or expectation of obtaining new capital, or consolidating with other banks so as to make a new and solvent institution, is very different from a hope and belief that the bank is not, in fact, then insolvent because its present assets may prove to be sufficient, or that, in and of itself, it may better its condition so as to become solvent.   The expectation or hope of forming a new and solvent bank does not and cannot change the fact of hopeless insolvency then actually existing, and should not be permitted to change the rights of the depositor, who relies upon the open door of the bank as a representation of its solvency.   Any other rule will open the door to such fraud as ought not to be countenanced.

The authorities relied upon by the majority upon this branch of the case all clearly recognize the distinction I am here attempting to make.   In *Brennan v. Tillinghast,* 201 Fed. 609, the bank, while insolvent at the time of receiving the deposit, was held to be in such a condition that its officers had reason to believe that by continuing in business it might retrieve its fortunes.   No such fact here exists.   To the same effect is *Steele v. Commissioner of Banks,* 240 Mass. 394, 134 N. E. 401, and in *Quin v. Earle,* 95 Fed. 728, it clearly appeared that there was reasonable hope of realizing on assets of the bank.   No such hope here existed. As already pointed out, the bank officers had no hope of realizing from the assets of the bank, or that the bank would ever, in and of itself, recover a sound

financial standing and be able to continue its business. The only hope of its officers was in the organization of a new and solvent corporation which would assume the liabilities of the bank. In my judgment, this ought not to suspend the salutary rule to the effect that, where deposits are received when the bank is hopelessly insolvent, to the knowledge of its officers, that is such a fraud as will entitle an unsuspecting depositor to rescind and recover back the money, or give him a preferential claim, or create a trust *ex maleficio* in his favor.

I therefore dissent.

FULLERTON, J. (dissenting)—I concur in the conclusion reached by Judge Tolman.