In re Miners & Merchants Bank of Nanty-Glo, Pennsylvania

*George F. Taylor, Jr.,* and *George L. Reade,* for accountant on all exceptions; *Philip N. Shettig,* with them on exception of School District of Nanty-Glo Borough.

*Philip N. Shettig* and *A. Evans Kephart,* for exceptants John W. Kephart and J. H. Weaver.

*Reuel Somerville,* for First National Bank of Patton.

*Philip N. Shettig,* for Hugh Kelly.

*Clarence E. Davis,* for School District of Nanty-Glo Borough and H. E. Metzler.

McKENRICK, J., September 5, 1932.—This matter comes before the court on the exceptions to the first and partial account of William D. Gordon, Secretary

of Banking, through George F. Taylor, Jr., special deputy in charge of the Miners & Merchants Bank of Nanty-Glo, Pa. Numerous exceptions and claims have been filed which, if allowed, will necessitate changes in the account as filed. Hearings were had upon the said exceptions and claims, at which testimony was given on behalf of the exceptants and claimants, as well as on behalf of the receiver. On the basis of the testimony so produced, disposition is now made of the following exceptions and disputed matters, and the statement of facts given in connection with the various claims is to be considered as the findings of fact of the court in regard thereto.

### Exceptions of John W. Kephart, J. H. Weaver and First National Bank of Patton, Pa.

The above exceptants were owners of certain shares of stock of the Union Bank of Nanty-Glo, which was consolidated with the Miners & Merchants Bank of Nanty-Glo. The latter bank agreed to redeem the stock of the Union Bank at $8.55 per share. The Miners & Merchants Bank set up on its books sufficient moneys to take care of this stock when presented for payment. The moneys were never segregated, however, but remained in the general funds of the bank. Exceptants claim to be preferred creditors and entitled to be paid in full. The accountant, however, contends that the exceptants are general creditors and are entitled to receive only a dividend on their claims.

The case of Com., ex rel., v. Tradesmens Trust Co., 61 Pa. Superior Ct. 137, has been cited as sustaining the position of the accountant. In that case the principle is laid down that where a trust fund has been mingled with the general assets and the identity of the fund cannot be traced, the right to pursue it fails. In the present case, however, the fund held by the bank for the redemption of stock was not derived from moneys deposited by the owners of said stock. There was not the usual relation between bank and depositor which would constitute the bank debtor and the depositor creditor. It seems that this makes some difference, as was pointed out in Conneautville Bank's Assigned Estate, 280 Pa. 545, 549, where the court referred to a statement in the opinion rendered in Webb v. Newhall, Assignee, 274 Pa. 135. None of the exceptants were depositors in the Miners & Merchants Bank, and the indebtedness of said bank did not arise out of the relationship of banker and depositor.

The funds were sufficiently earmarked, we think, to enable the exceptants to claim them. No creditors are here objecting. Ordinarily a check drawn on a bank should be presented for payment within a reasonable time, but the present case does not involve payment of a check, and the delay in presenting the stock for redemption should not militate against the exceptants. We, therefore, sustain the exceptions in each of the above cases and direct that the accountant pay to John W. Kephart the sum of $171, to J. H. Weaver the sum of $171, and to the First National Bank of Patton, Pa., the sum of $256.50, and that the account be so amended and corrected as to show compliance with this order.

### Exceptions of Hugh Kelly

Hugh Kelly was the tax collector in the Borough of Nanty-Glo and had on deposit in his checking account on October 25, 1930, the sum of $244.38. On Saturday evening, October 25, 1930, between the hours of 6 and 8 o'clock, the Miners & Merchants Bank being open, Kelly deposited currency in the amount of $70, checks drawn on the Miners & Merchants Bank aggregating $331.19, and checks and money orders drawn on other banks aggregating $345.09, making a total of $746.28. The items included in the Saturday evening deposit were entered in Kelly's passbook, but whether the entry was dated October 25, 1930,

does not appear. The items included in the deposit, however, were not entered upon the books of the bank. The cash deposit of $70 was mingled with the funds of other depositors. The bank did not open on Monday morning, October 27, 1930.

From the testimony before us, the checks drawn on the Miners & Merchants Bank were never entered upon its books and never operated to reduce the deposit fund of the drawer of the check nor to increase the deposit fund of the payee. The checks were never paid by the bank from the funds of its depositors in its hands. The checks and money orders drawn on other banking institutions, aggregating $345.09, were collected by the receiver after he took charge of the bank. In the case of Eppinger, Exec'r, v. Allen et al., Trustees, 8 D. & C. 321, 329, it is said:

"When a bank, which becomes insolvent or which makes an assignment for the benefit of creditors or goes into the hands of a receiver, has at that time uncollected paper on hand, its authority to collect is thereby terminated and the depositor is entitled to a return of the paper; if, instead, it is actually collected, the depositor is entitled to a return of the proceeds".

In the case before us, the receiver collected the moneys represented by the checks and money orders from the institutions on which they were drawn, and he holds that money for Hugh Kelly, the payee in the checks. Hugh Kelly is, therefore, a preferred creditor to the extent of $345.09 and should be paid in full.

So far as the checks drawn on the Miners & Merchants Bank are concerned, there could be no withdrawal from the deposit fund of the maker of the check and a corresponding addition to the deposit fund of the payee except upon the books of the bank. The entry in the passbook of the depositor does not, we think, change the situation. If the checks so deposited had for any reason not been paid, the bank would have the right to "charge back" the uncollected paper. We understand that section 25 of the Banking Act of June 15, 1923, P. L. 809, as amended by section 9 of the Act of May 5, 1927, P. L. 762, provides that the status of the parties shall be created as of the date of possession. The bank ceased to do business when it closed its doors at 8 p. m. October 25, 1930. The status as it then existed was this: The bank had on its desks or in its vaults certain checks and money orders turned in by Hugh Kelly. The mere possession of the checks and money orders did not increase the bank's assets, nor did they reduce the deposits of the drawers or increase the deposit of the drawee. The bank was only custodian of the papers and could have handed them back the next day. The case is different, however, as to the $70 deposited in cash. It is not shown that the money was segregated as in the case of Corn Exchange National Bank v. The Solicitors' Loan & Trust Co., 188 Pa. 330, where, when the bank suspended, $2,000 in two-dollar bills was found intact in a package, or, as in the case of Washington Shoe Mfg. Co. v. Duke, etc., 126 Wash. 510, 218 Pac. 232, referred to in Eppinger, Exec'r, v. Allen et al., Trustees, supra, at page 327, where all the deposits made on the day before the bank suspended business were placed in separate envelopes bearing the name of the particular depositor. The essential thing to constitute a person a preferred creditor as to a cash deposit is his ability to trace the cash, and that ability is lacking in the present case and, therefore, no preference can be allowed for the item of cash. The deposit of Hugh Kelly was, then, as of the date of taking possession of said bank, the sum of $314.38. We understand that it is the custom of banks such as the Miners & Merchants Bank, keeping open on Saturday nights for the accommodation of the public, to enter the deposits of cash and checks as of the next business day, to wit, the following Monday. The receiver evidently found the

checks in the vault and proceeded to enter them upon the books, charging the accounts of the drawers of the checks and crediting the accounts of the payees. We think the proper practice would have been to segregate these checks or to have returned them to the depositor so that he would have the evidence to show that the debt represented by the checks was unpaid. The status of the parties was fixed as of the date of possession, and the entry of these items on the books by the receiver could not change that status. It would seem that if he had authority to enter these checks on the books as of Monday or Tuesday, he could have done it at any time during his incumbency.

The status was fixed as of the time he took possession of the bank, and no act of his could change that status to affect the rights of any claimant. We think the solution of this problem requires that the checks drawn on the Miners & Merchants Bank should be delivered to Hugh Kelly, and the notation on said checks, if any there be, indicating payment by the bank, canceled. This will necessarily result in an increase in the amount of the deposit standing in the name of each of the persons by whom the checks were issued; consequently, the dividend due each of these depositors will be increased. We therefore make the following order:

1. The accountant shall make distribution of the 23 percent dividend to Hugh Kelly upon the amount of his deposit, to wit, $314.38.

2. The item of $345.09, represented by checks and money orders collected by the receiver, is a preferred claim and shall be paid in full to Hugh Kelly.

3. The checks of Frank Lauer, $130, Mary Hines, $200, and John W. Miller, $31.19, are to be delivered to Hugh Kelly, with proper notation thereon, as evidence of their nonpayment.

4. The deposit account of Frank Lauer, Mary Hines and John W. Miller shall be increased by the amounts of said checks heretofore deducted, and the dividend of 23 percent paid to them unless there are claims of the bank against said dividend.

5. If the dividend has been paid to Hugh Kelly for an amount in excess of 23 percent on $314.38, the overpayment is to be deducted from the $345.09 in the hands of the receiver.

### Exceptions of the School District of the Borough of Nanty-Glo

The School District of Nanty-Glo Borough designated the Miners & Merchants Bank as its depository, and required the said bank to furnish a depository bond conditioned that the said depository would account for and pay over all moneys deposited by the school district. The School Code of May 18, 1911, P. L. 309, art. v, sec. 509, provides for the designation of a depository and the furnishing of a proper bond with surety or sureties as may be required before the depository may receive any funds of the school district, and a bond in the sum of $8,000, dated March 15, 1930, was furnished by the Penn General Casualty Company of Philadelphia. Under the terms of the bond, the surety had the right to terminate its suretyship by serving notice of its election so to do, and, pursuant to this right, the surety company did notify the bank and the school district of its intention to terminate its obligation under said bond. Under date of June 12, 1930, the Miners & Merchants Bank agreed, in lieu of a depository bond as required by the school district, to pledge as security for the deposit of the school district certain bonds owned by the bank. These bonds were delivered to the Diamond National Bank of Pittsburgh, Pa. It was considered by all the parties concerned, and was part of the contract, that the bonds so pledged were to stand in the place of a depository bond and with the

same effect. At·the date the Department of Banking took possession of the Miners & Merchants Bank, the total deposit standing in the name of the School District of the Borough of Nanty-Glo was $32,159.16. The value of the bonds pledged for said deposit at that date was $14,625.

The school district claims that it is entitled to receive a dividend of 23 percent upon the amount of the deposit, to wit, $32,159.16, without regard to the value of the securities pledged. On the other hand, the accountant contends that the school district must first value its security and deduct said value from the deposit, receiving a dividend on the balance only. Pending the determination of this question, all dividends due the school district were suspended. All parties concerned agreed that the pledge of the bonds was a good pledge.

We understand that under the Bankruptcy Act of 1898 a claimant must elect either to apply the value of his security upon his claim, prove the balance, or return the collateral and prove as a general creditor. The Act of June 4, 1901, P. L. 404, sec. 28, also provides that collateral security held by a creditor shall be valued, and if the security is retained by the creditor his dividend shall be on the difference between the claim and the value of the security. We think that the present case does not come within either of the acts mentioned. We think the principle involved in this case is set forth in Fulton's Estate, 65 Pa. Superior Ct. 437, where it is said, "The appellant was also the pledgee of certain shares of bank stock which, through a trustee, he held as collateral security for the payment of his debt. Under the terms of the pledge he could not be compelled to surrender his security until his debt was paid in full. The insolvency or death of his debtor would in no way affect his right to the full use of his collateral. That right rested not on general laws disposing of the property of insolvent debtors, dead or alive, but on the contract of the parties. The fact that he thus had recourse to two funds in no way impaired his right to proceed against either or both so long as he did not claim or secure more than was justly due."

The school district had the right, under the law, to require a depository bond, and when the bank failed to continue such bond in force, the account could and properly should have been withdrawn. We can see, however, that the loss of such a substantial deposit would have placed the bank in a serious plight. In order to retain the account, the bank agreed to pledge certain securities with the understanding that the securities so pledged were to take the place of a depository bond and to be governed by the rules relating to depository bonds. We see no reason why the bank should not make such a contract. It was solvent at the time the agreement was made. No one has raised the question as to the bank's right to pledge its securities for the payment of any particular deposit. The terms of a depository bond, as we understand them, guarantee the accounting for and payment of all deposits not exceeding the amount of the bond. Nothing less than the actual repayment of the deposit will ordinarily support a defense on the part of the bondsman that the deposit has been paid. If a depository bond had been given the school district would have recourse against the bondsman for any deficit. In this particular case, a dividend of 23 percent has already been declared, although the payment of said dividend due to the school district has been suspended. It is very evident that the deposit of the school district will not be paid in full and the bondsman, if any, would be liable only for the deficiency. That deficiency could not be determined until the school district had received a pro rata share of the available funds in the hands of the bank. The bondsman, if a depository bond had been given, would have been liable only for the shortage. The school district takes the position that it is not obliged to value its security or dispose of same, but may hold it until the actual shortage is determined. After this shortage is determined, the school

district claims the right to apply the securities on the balance until its entire deposit has been paid in full. If the value of the security, when applied by the school district, is more than enough to pay the school district in full the overplus belongs to the bank for the payment of creditors generally. This theory of distribution is the one that would apply in the case of a depository bond and, we think, governs distribution in this case. It is true the principle cited in Fulton's Estate, supra, was enunciated in an orphans' court proceeding, but we call particular attention to the statement that the "right rested not on general laws disposing of the property of insolvent debtors, dead or alive, but on the contract of the parties". In this case the bank made a contract and that contract should be carried out even though the bank is insolvent.

The question has not been raised as to the bank's right to make such a contract, or as to the school district's right to join in it. As a matter of policy, the bank should never have made such a contract. However, certain discretion is vested in the board of directors of a bank and the persons depositing their funds in that bank rely upon the good judgment of the managers. If the judgment of those in charge of the institution is good, the bank may flourish; on the other hand, if the judgment is bad, the depositors may suffer a loss.

Our conclusion is, therefore, determined on the basis of the contract which the bank and the school district entered into when the security was pledged in lieu of a depository bond. A great public interest is also involved in this particular situation. If the school district is required to value its securities and claim dividends on the balance only, great loss will result to the school district, which will be reflected in the curtailment of the public school activities of Nanty-Glo. The community generally, having paid taxes for the support of the public schools, should not be penalized by the loss of public moneys which would be the result if the contention of the accountant prevails. It is true the dividends of individual depositors may be increased somewhat if the accountant's contention is adopted. We think, however, the public good in this particular case rises higher than the rights of individuals and, on the basis of the contract mentioned, the contention of the school district impresses us as being correct and according to law. We, therefore, make the following order:

The accountant is directed to make distribution of the 23 percent dividend to the school district of the Borough of Nanty-Glo upon the full amount of the deposit, to wit, the sum of $32,159.16.

### Exception of H. E. Metzler

At the time the Miners & Merchants Bank of Nanty-Glo closed on October 27, 1930, there was a savings account in the name of Mr. or Mrs. Hempel Metzler, otherwise Mr. or Mrs. H. E. Metzler, in the sum of $2,363.80. H. E. Metzler, also had on deposit in a Christmas savings fund the sum of $235. At the time the bank closed H. E. Metzler was indebted to the bank in the sum of $580, which was secured by a promissory note signed by him, the said H. E. Metzler, alone. The savings account in the name of Mr. and Mrs. Metzler was assigned as collateral security for the note. It will be noted here that Mrs. Metzler did not sign the promissory note, nor did she join in the assignment of the savings account as collateral security.

In the distribution made by the bank, the $235 deposit in the Christmas savings funds by H. E. Metzler was applied as a set-off on the said note in the sum of $580, leaving a balance due on the note of $345. The accountant refused to permit the account in the name of Mr. and Mrs. Metzler to be set off against the balance due on the note, and this exception was filed.

It has been decided many times that an account in the name of A "and" B, or an account in the name of A "or" B, where a husband and wife are involved, creates an estate by entireties: Klenke's Estate (No. 1), 210 Pa. 572; Sloan's Estate, 254 Pa. 346; Milano et ux. v. Fayette Title & Trust Co., 96 Pa. Superior Ct. 310; Pennsylvania Trust Co. v. Mischik, 96 Pa. Superior Ct. 255. A cardinal rule of set-off requires that there be mutuality of demand, both as regards the quality of the right and identity of the party; by mutuality in quality of right is to be understood mutuality of right with respect to the legal remedy provided for the enforcement of the several demands: Hunter, Receiver, v. Henning, 259 Pa. 347. An estate by entireties operates as an entity in law just the same as a corporation or as an individual. Consequently, the maker of the note, the husband, is one entity, and the estate by entireties is another entity. While an estate by entireties continues, it is impossible for either party, without the other joining, to sell or assign his or her interest therein, even the expectancy of survivorship: Beihl v. Martin, 236 Pa. 519.

The deposit in the savings account in this case was an estate by entireties. Neither of the parties had the right to go to a third party and pledge the account for his or her individual debt. See Penna. Trust Co. v. Mischik, supra, and Milano et ux. v. Fayette Title & Trust Co., supra. We believe that the cases last cited are in point and the principle therein set forth governs in this case. The money on deposit in the savings account did not belong to the husband, or half to him and half to his wife, or in part to either, but to both of them undividedly.

"In the absence of an express agreement that the money could be paid to either or only one of them, the implied agreement would be that the money could not be withdrawn except upon checks or orders signed by both of them and the bank could pay differently only at its peril. To hold otherwise, would put it in the power of either to destroy the estate by entireties by withdrawing the fund and applying it to his or her own use without the joinder or acquiescence of the other spouse; which is directly opposite to the nature and character of a true estate by entireties. The right of survivorship of a true tenancy by entireties, which is one of its chief incidents, cannot be destroyed but by the joint act of the two. Neither husband nor wife can sever a true tenancy by the entirety." We have quoted from the syllabus in the case of Milano et ux. v. Fayette Title & Trust Co., supra.

If the bank had attempted to use for the payment of this note the collateral pledged by the husband alone, it might have been required to pay the money a second time on the joint order of the husband and wife. The husband had no right to pledge the savings account as collateral and the bank secured nothing substantial by accepting such a pledge. If the husband and the wife had both signed the note and had jointly pledged the savings account as collateral, then it might have been a good pledge and the bank could have used the collateral if it was found necessary to enforce payment of the note. If the husband in this case did not have the right to pledge the savings account standing in the name of himself and wife as security for his individual note, he certainly cannot set off against that note the savings account in the absence of his wife's joinder. In this case there was not the mutuality upon which the right of set-off is founded. As was said above, if either of the parties could pledge the account held by them jointly for the debt of one, it would in effect destroy the tenancy by which they hold the account. It has been intimated in some of the cases cited to us that either the husband or the wife might have checked against the account. While we are not called upon to decide that question, we believe the authorities are to the contrary. If either has the right to check against the account in the absence of a special agreement with the bank to that effect he can withdraw all

of it without the other's consent, and thus destroy the very title by which the parties hold.

The dividends upon this joint account are the property of the husband and the wife, and we do not think that the receiver would have the right to appropriate the dividend declared upon an estate by entireties to the payment of a note given by one alone. Property, real or personal, held jointly in the names of husband and wife, belongs to the survivor: Rhodes's Estate, 277 Pa. 450; Sloan's Estate, 254 Pa. 346; Bramberry's Estate, 156 Pa. 628. It will thus be seen that after the death of one of the parties the survivor is entitled to the whole estate. Neither party, without the consent of the other, can destroy the right, nor can either party, without the other's consent, do anything that will affect the right of the other in the property. The property cannot be levied upon and sold in the lifetime of both, and any severance of the estate must be by the joint act of both. We have therefore come to the conclusion that the security pledged to the bank for the $580 note signed by the husband alone was not a good pledge and the bank would not have been able to enforce collection of this note out of the collateral. The wife not having joined in the pledge of the account, it had no efficacy in the hands of the bank. The entities here are separate and distinct; on the one hand the husband alone, and on the other the husband and wife. Taking into consideration the nature of an estate by entireties, and the incidents thereto, we do not believe the joint savings account can be set off against the claim of the bank against the husband alone.

In the case of Jack v. Klepser, 196 Pa. 187, it was held that where a deposit in a bank at the time of the bank's failure is the property of two partners and subsequently one of the partners assigns his interest in the deposit to his copartner, the latter may set off the deposit against a note held by the bank of another partnership of which he is a member, and that this may be done even after suit was brought. In that case, however, one of the partners assigned his interest in the firm deposit to his copartner, so that it might be set off against the claim of another. In the present case, there has been no assignment or joinder on the part of the wife that would give her husband the right to use the joint fund as a set-off against the bank's note.

In this case we are also confronted with another proposition. It is the duty of the receiver of a closed bank to realize the most from the assets for the benefit of all the creditors. If proceeding upon the collateral will not produce cash and cash must be collected by execution upon the note, the receiver is obliged to adopt the latter method. It is true that if a borrower from a bank is also a depositor he may set off his deposit against the loan. In this case, however, H. E. Metzler was not a depositor so far as the savings account was concerned; the deposit was made by himself and his wife jointly. So far as the savings account was concerned, it was merely collateral, and hence the relation of debtor and creditor with respect to that particular account did not arise between the bank and H. E. Metzler.

We have examined a large number of cases bearing upon the points involved, and we have come to the conclusion that the incidents of an estate by entireties are fixed, and the only two things that will destroy the estate are the joint act of both the husband and wife in the lifetime of both or the death of either spouse. We think the accountant was correct in his interpretation of the law when he refused to allow as a set-off the joint savings account.

The exception of H. E. Metzler, which raises this question, is, therefore, dismissed, and the accountant is directed to pay the dividend on the joint savings account to the persons depositing the same.

From Henry W. Storey, Jr., Johnstown, Pa.