JOHN WHITE, CLAUDE WHITE, AND RICHARD WHITE, RESPONDENTS,
v. A. E. POOLE ET AL., APPELLANTS.

Kansas City Court of Appeals. May 4, 1925.

**1.—Banks and Banking—Evidence Held to Justify Finding That Bank Was Insolvent at Time Deposits Sued for Were Made and That Directors Had Knowledge Thereof.** In a suit under provisions of sections 11763 and 11764, Revised Statutes 1919, to recover from bank directors, deposits alleged to have been made in bank at time when defendants had knowledge that it was insolvent or in failing circumstances, evidence **held** sufficient to justify finding that bank was insolvent and in failing circumstances at time deposits sued for were made, and that defendant directors had knowledge that deposits were made under such conditions.

**2.—Same—While Knowledge Required of Bank Directors as to Insolvency of Bank is Actual Knowledge, Such Knowledge May be Inferred from Facts**

and Circumstances. Under sections 11763 and 11764, Revised Statutes 1919, the knowledge required of bank directors that bank was insolvent or in failing circumstances at time deposits were received is actual knowledge, but such knowledge like any other fact may be inferred from facts and circumstances.

3.—Same—Action Against Bank Directors to Recover Deposits Made When They Knew Bank Was Insolvent May be Brought by Depositors in Person. Under sections 11763 and 11764, Revised Statutes 1919, a suit to recover from bank directors deposits made when directors knew bank was insolvent or in failing circumstances, is not required to be brought by commissioner of finance, but may be brought by depositors in person.

4.—Same—In Action Against Directors to Recover Deposits Made When They Knew Bank Was Insolvent, Directors Cannot Offset Withdrawals Against Amount of Deposits Sued For. In an action to recover from directors deposits received by bank while it was insolvent or in failing circumstances, by depositors making deposits before insolvency, held defendants cannot offset withdrawals against amount of deposits sued for, when to do so would prevent depositors from recovering full amount deposited during insolvency.

5.—Instruction—Instruction That Burden Was on Bank Directors to Show That They Did Not Have Knowledge That Bank Was Insolvent or Did Not Assent to Reception of Deposits at Such Time Held Not Erroneous in View of Defendants' Instruction. An instruction that burden was on directors of bank to show that they did not have knowledge that bank was insolvent or did not assent to reception of deposits during insolvency held not erroneous in view of defendants' instruction that if defendants had no knowledge bank was insolvent or in failing circumstances jury should find for defendants.

*Corpus Juris-Cyc. References: Banks and Banking, 7CJ, p. 564, n. 30; p. 571, n. 26 New, 37 New; p. 573, n. 61; Insolvency, 32CJ, p. 809, n. 49; Trial, 38Cyc, p. 1779, n. 74, 75, 76.

Appeal from Circuit Court of Randolph County.—Hon. A. W. Walker, Judge.

AFFIRMED.

*D. M. Wilson, A. G. Knight, W. A. House, H. J. West* and *Hunter & Chamier* for appellants.

*M. J. Lilly, P. M. Marr, R. E. Ash, Alpha L. Burns* and *John H. Taylor* for respondents.

BLAND, J.—This is a suit brought under the provisions of sections 11763 and 11764, Revised Statutes 1919, to recover from the directors of the Milan State Bank of Milan, Missouri, deposits alleged to have been made in the bank at a time when the defendants had knowledge that it was insolvent or in failing circumstances. The petition is in nine counts, each covering a separate deposit. There was a verdict and judgment in favor of plaintiffs on each

count, the total recovery amounting to $1518.29. Defendants have appealed.

The Milan State Bank was organized in the month of May, 1920, at the instigation of the representatives of the State Finance Department, to take over the affairs of the Milan Bank, hereinafter referred to as the old bank. The old bank had failed and closed its doors on May 12, 1920. The new bank took over at face value all the assets and assumed all the liabilities of the old bank. It was organized with a capital stock of $70,000 and surplus of $7,000, all paid up in cash. It opened with deposits in the sum of $326,741.90; bills payable in the sum of $160,000, and loans amounting to $419,-986.92; its total assets as shown by the books were $576,269.05.

A contract was made between the two banks whereby the new bank took over all the affairs of the old bank including all its assets and liabilities. The capital stock, surplus, undivided profits and net earnings of the old bank amounted to $63,549.84 and the contract provided that these were to be held as guaranty fund against any bad notes among the assets conveyed and were to be carried as a demand deposit to be "immediately available for the purpose of taking up notes that can neither be collected or renewed in a manner satisfactory to the officers and Board of Directors of the Milan State Bank." Due diligence of the new bank was required in the matter of attempting to collect the notes taken over and it was provided that they might be held by the new bank for the purpose of collection, even after being charged to the guaranty fund. The new bank opened for business on May 24, 1920, and continued in business until October 13, 1921, a period of sixteen months and nineteen days when, on account of its not being able to raise money to replenish its reserve fund, it closed its doors by resolution of its Board of Directors notifying the Commissioner of Finance to come and take charge.

The deposits sought to be recovered in this case were made from time to time beginning on June 11, 1920, and ending on September 17, 1921, and aggregating the sum of $1436.55. Plaintiffs when the first deposit sued for was made, had $268.75 on deposit in the bank, and from June 11, 1920, to the closing of the bank they checked out and withdrew from the bank $225.80, leaving a balance in the bank of $1479.50 when it closed. It appears to be admitted that nothing has been paid to the depositors since the closing of the bank and its taking over by the Commissioner of Finance, but as to what has been realized out of the assets of the bank or the amount of money on hand available for the payment of the bank's debts, is not shown.

At the close of its business the books of the bank showed loans in the sum of $322,043.82 capital stock and surplus of $80,000; de-

posits in the sum of $106,349.14; bills payable in the sum of $138,-425, the books showing the total assets in the sum of $372,804.14. There was, therefore, a decrease in the assets of the bank of $203,-464.91 in sixteen months and nineteen days, or a decrease in its assets of about $12,000 a month during the period of its operation. During the same period its deposits, exclusive of the guaranty fund, decreased about $160,000, or at the rate of a little less than $10,000 per month; the bills payable and bills rediscounted for the same period decreased only $10,915, or about $656 a month. At the time of the closing of the bank the bills receivable amounted to $321,-656.68. This included notes held by the bank and signed by its customers. Only 8.34 per cent of the bills receivable was secured by first deeds of trust on real estate; 43.22 per cent was secured by second deeds of trust; 1.91 per cent secured by third deeds of trust; 2.78 per cent secured by first, second or third deeds of trust, the Examiner being unable to tell which; 8.53 per cent of the total bills receivable was secured by chattel mortgages on crops and live stock; 2.09 per cent was secured by personal indorsements; 31.25 per cent, or over $100,000, was unsecured in any way; 1.81 per cent of the total of bills payable was in installment commission notes but the Examiner was not able to tell whether or not they were secured.

Among the assets taken over by the bank in May, 1920, were notes of nineteen persons (referred to in the brief as "nineteen large borrowers") which aggregated the sum of $210,513.37. Very little of these loans had been reduced at the time of the closing of the bank but the total amount was increased by reason of the debtors being unable to pay the interest on the renewal date of the notes. The indebtedness of these parties was not increased by the lending of additional money except in case of one person who was lent an additional sum of $2500. At the close of the bank the indebtedness of these nineteen borrowers amounted to $247,748.45, but this increase in the amount of the indebtedness was not entirely due to the things we have mentioned but in greater part by reason of the consolidation of the loans of other persons with some of the loans made to the nineteen persons in question and the purchase by the bank of notes aggregating $5598.35 secured by first mortgages on the real property of one of the nineteen large borrowers, in order to protect subsequent deeds of trust held by the bank.

At the time of the closing of the bank the guaranty fund had been depleted by the charging off of notes taken over from the old bank under the provisions of the contract so that a balance of only $3,416.92 remained. Most of the deeds of trust securing the loans of the nineteen large borrowers were on farm lands in Sullivan county and vicinity. The testimony shows that in the latter part

of 1920 the market price of farm lands began to fall rapidly so that they declined from twenty-five to thirty per cent from 1920 to 1921. At this rate there must have been a decline of from eight to ten per cent in the land values in the four months period covering the time in which these deposits were made. The testimony shows that the efforts of the new bank from the time of its opening were mainly directed to collecting loans that it had taken over, and that it did not make very many new loans; one of the directors testified that "conditions were such that we didn't feel like we needed any more loans . . . we were trying to collect and reduce loans instead of increasing them," but that they were taking deposits all of the time. The bank was having a hard time to keep its legal reserve on hand. Beginning with April 15, 1921, and ending with October 13, 1921, when the bank closed, there were thirteen business days in which it did not have the cash reserve required by law and in this calculation the guaranty fund is treated as an asset of the bank and not as a deposit. The reserve was below the legal requirement for one day prior to the time the first of the deposits in question was made and four days prior to the making of the last of these deposits.

The evidence further shows that on July 23, 1921, the total amount of the indebtedness to the bank of five of the nineteen large borrowers was $140,456.22; that the loans of each of these five exceeded the limit allowed by law and that the indebtedness of one equaled to forty-five per cent of the bank's capital stock and surplus. From June 1 to October 13, 1921, more than $54,000 of the bank's loans was charged off to the guaranty fund; from the 11th day of June, 1921, the day the first deposit sued for was made, until the bank closed, its assets decreased at the rate of a little over $4,000 a month while its bills payable or its indebtedness to other banks decreased at the rate of only $114 per month.

Three of the seven directors of the bank had no deposit in the bank at the time it closed; those who had money on deposit owed the bank $3274 more than they had on deposit; the three directors who had no money on deposit owed the bank over $8563. The directors as a whole owed the bank $12,215 when it closed. Some of the directors had overdrafts. As a whole the directors were liable to the bank for $9,966 in excess of their deposits in that institution. One of the bank's directors testified that he and his partner in another business did most of their business with two other banks in Milan. This unusual procedure of accounts being kept in other banks, was put upon the ground that it was intended for the purpose of promoting the interests of the business. There is no evidence that any of the directors were insolvent or unable to pay their indebtedness to the bank but their relation to the bank in

220 Mo. App.—62.

this connection was material as tending to show that they realized the shaky condition of the bank.

On July 23, 1921, $60,000 of the loans was overdue, approximately one-half of which had been overdue for thirty days and the other half for six months. On that day the bank owed its four city correspondent banks $150,000 and had $17,725 in notes rediscounted with one of them. There is evidence in the record that $10,000 was borrowed from one of these banks on April 18 and $10,000 in December, 1920, but defendants insist that these were merely renewals of old loans and that most of the money due the city banks was on account of renewals of loans that were made by the old bank and assumed by the new. At any rate on the day in question the bank owed the city banks $150,000 in money representing direct loans, these loans falling due in August, September and October, 1921. These loans were all renewed at their maturity after approximately $12,000 had been paid on them so that when the bank closed the bills payable were approximately $138,000. On that day there was a suit pending against the bank for $30,000 which if won by the plaintiff therein would further enhance the liabilities of the bank.

On July 11 and 12, 1921, the reserve fund was below the legal minimum requirement. On July 14, 1921, the Board of Directors ordered the cashier to go to Kansas City in order to confer with banks there in an effort to secure the loan of more money for the use of the bank. One of the directors testified that the cashier went to Kansas City to find out if the bank could secure new money if it needed it, and to see if it was agreeable to the city banks, to which it was already indebted, to continue the credit or renew the notes; that the cashier's visit was "more particularly in connection with renewals;" that the witness did not remember any occasion for the need of any money at that time but that they wanted to know whether they could secure more money, "it was a question of preparedness."

In the report of the State Bank Examiner, who made an examination of the bank on July 23, 1921, the condition of the bank was gone into thoroughly and the loans of fifteen of the largest borrowers were discussed. The report stated—

"These excessive and practically all of this bank's loans were taken over from the Milan Bank when that Bank closed last May, 1920, and loans as a whole are considered by your examiner to be in bad shape and considerable loss probable. Loss however is guaranteed by capital and surplus of Milan Bank, $58,419.29. It is the opinion of your examiner that these loans will have to have attention and be properly handled if this guarantee fund proves large

enough to cover the loss. . . . This bank was organized at the instigation of the Examiner in charge of the Milan Bank and the paper taken over and how held is of course no direct fault of theirs and this bank of course entitled to some consideration because of the above facts. The officers and directors seem capable and have been diligent in their efforts to clear up the paper and did what they thought best at the time but the way it has been handled as conditions have turned out has not brought the results desired. In fact your examiner believes they are in worse shape than when they first took over the Milan Bank due to decline in the price of farm lands. Your examiner believes that had they proceeded to liquidate the loans and have charged the losses as they were definitely established to the guarantee fund the loss would have probably been smaller than now, but in their efforts to save as much as possible for the stockholders of the old Milan Bank believe they have been a little over zealous to their own detriment and believe that great care and judgment will now have to be used to prevent loss to themselves. Instead of liquidating the especially doubtful loans taken over they thought to save loss by renewing this paper and in many instances succeeded in partially securing the loan, but prices have declined to such an extent that even with the security they obtained in some cases at least the loss will probably be greater now than it would have been had they collected what they could and charged the balance off . . . it seems to your examiner that about all they have succeeded in doing is prolonging the inevitable and getting things badly mixed. The paper now held by the Milan State Bank is certainly very lightly secured, very undesirable and in many cases very doubtful and your examiner believes will have to be exceptionally well handled if the $58,419.29 guarantee fund is large enough to cover the loss. . . .

". . . in view of the very large bills payable and rediscounts now carried by the Milan State Bank and the very large loss probable on the loans held it seems to your examiner that as fast as this paper matures they should proceed to collect as much as possible and whatever loss is sustained should be charged to this guarantee fund and all loans taken over from the Milan Bank be cleaned up and this Milan State Bank be put in shape.

"It seems to your examiner that in view of the circumstances under which this bank was organized that they are of course entitled to some consideration but do not believe it gives them the privilege of carrying these excessive and doubtful loans indefinitely and that they should have been cleaned up before now. Of course it would be impossible to foreclose all of the second and third and fourth deeds of trust now but at least some of them can be and should be as this bank is badly overloaned anyway.

"Their notes as a whole are secured by very lightly trust deeds, seconds, thirds and fourths and by chattel mortgages on crops, livestock, etc. And badly mixed with much past due papers and loans generally in bad shape. . . . .

"103 accounts overdrawn indicates a very lax method in this department."

On August 11, 1921, the Commissioner of Finance wrote to the president of the bank calling the attention of•the bank to the fact that $60,000 of its loans were past due, that five of the borrowers of the bank were indebted in excess of the limit allowed by law, that "you cannot be permitted to violate the law in this way. I will insist that those loans be promptly brought within the legal limits." He called the bank's attention to the loans of the fifteen borrowers mentioned in the examiner's report where it was stated that the security for the loans was either undesirable or insufficient, and that a large loss was quite probable in connection with most of them and the fact that one hundred three accounts were overdrawn, and stated that the report shows—

"Your notes are lightly and insufficiently secured, and it will take a determined effort on the part of your officer and Board to bring your bank to a standard condition. All of your loans which are protected by second, third and fourth loans should be liquidated in some manner as promptly as is possible. Whatever loss appears should be charged to the Milan Bank Guaranty Fund. Until such time as you can get your bank in a more standard condition, you cannot be of proper service to your community. Further delay, in my opinion, will not only embarrass your own bank but will result in more loss to the stockholders of the Milan Bank."

As the result of this letter from the commissioner $46,000 of the loans to these parties was charged off and charged to the guaranty fund. On August 25, 1921, in reply the bank wrote the Commissioner of Finance that—

". . . it is a well-known fact that the last six or nine months has been a very bad time to liquidate or force collection on full loans on live stock or second or third mortgages on land, and we wish to state in this connection that many heavy loans when taken over were without any security at all."

This was given as an excuse for failure to make collection of the notes. Referring to the $60,000 past due paper, the letter states—

"This excess amount is brought about by our having so many large real estate loans where the parties were actually unable to pay the interest, and will not until they can realize on this year's crop or until the loan is foreclosed. In most every such case we hold chattel on crops and are in position to protect ourselves.

In reference to the difficulty in collecting loans the letter states—

"If the land is foreclosed now there will be a big loss, not that the land is not worth what is against it, but buyers cannot raise money to buy this land with when it is offered for sale. There have been four foreclosures recently in which the bank held the second and third mortgages and in each case was a complete loss."

On August 13, 1921, the Commissioner of Finance replying to the letter of the bank stated—

"In my letter of August 11th I pointed out the undesirable features of your bank to you as found by my Examiner and your Board should proceed towards the correction of these unsatisfactory conditions. . . . it must be evident to all concerned that present conditions cannot be permitted to continue indefinitely on the hope of realizing on second, third and fourth mortgages on real estate at inflated values."

Beginning with September 17, 1921, down to the time the bank closed, it was without the required legal reserve for nine days with the deficiency constantly growing. On October 10, 1921, the Board of Directors passed a resolution directing three of its directors to visit the city correspondent banks and arrange for a "further loan of credit if it was thought necessary to do so." These directors went to Kansas City but were unable to raise further money and when they returned the Board upon receipt of this information closed the bank and turned it over to the Commissioner of Finance.

Defendants insist that their instruction in the nature of a demurrer to the evidence should have been given and in this connection state that there was no evidence tending to show that the deposits sued for were made at the time the bank was insolvent or in failing circumstances, and that even if it were insolvent there is no evidence that the directors knew it at the time the deposits were made under such conditions. Of course, the statute, section 11764, makes the fact that the bank was in such a condition at the time the deposits were made prima-facie evidence of such knowledge but defendants insist that the evidence overcomes such prima-facie showing, if any.

It is admitted that the evidence shows that the bank "was not in a healthy condition because of a gradual decrease in its deposits, and the fact that its bills payable had not been greatly reduced," but defendants insist that taking the evidence in its most favorable light to plaintiffs as to the value of the real estate upon which the deeds of trust were given to secure the loans of the nineteen large borrowers that the bank stood to lose only $116,000, assuming that the signers of the note themselves were insolvent. In this connection it is contended that the capital stock, surplus, undivided profits and guaranty fund amounted to $147,527.46, and that there-

fore the evidence falls short by $31,029.84 of showing a sufficient deficiency in the security to equal the amount of the capital stock, surplus, undivided profits and guaranty fund; that the Bank Examiner and the Commissioner of Finance did not think that the bank was insolvent; that on July 14, 1921, the cashier ascertained that the Kansas City banks would lend the bank more money if necessary and that the bills payable would be renewed; that there was no reason for the directors' believing that the bank would not be able to survive during the time the deposits sued for were made and that under the facts and circumstances there was no insolvency.

Insolvency as applied to banks is defined as "inability to pay its debts in the usual and ordinary course of business." [State v. Burlingame, 146 Mo. 207; State v. Darroh, 152 Mo. 522; Mitchell v. Bradstreet Co., 116 Mo. 226, 240.]

"Solvency implies as well the present ability of the debtor to pay out of his estate all his debts, as also such condition of his property as that it may be reached and subjected by process of law, without his consent, to the payment of such debts. . . . a person may be insolvent, although he may be able to pay his debts at some future time on a settlement and winding up of his affairs." [14 R. C. L., pp. 628, 629.] "An ability to pay in the future or an excess of assets over liabilities without a present ability to pay debts as they become due in the usual course of business, is not solvency." [Eads v. Orcutt, 79 Mo. App. 511, 524.] "Insolvency is that condition of affairs in which a merchant or business man is unable to meet his obligations as they mature in the usual course of business." [2 Morse on Banks and Banking, p. 1035.] Insolvency is frequently defined as "inability to make payments as usual, or as they mature, or according to the undertaking, or in the ordinary course of business." [Stone v. Dodge, 96 Mich. 514, 524.] The stopping of payments on the part of a bank is evidence sufficient within itself of the insolvency of the bank "and when there is nothing to rebut the presumption the evidence of insolvency is conclusive." [Stone v. Dodge, supra.] The bank was therefore insolvent on October 13, 1921. "A bank is in *failing circumstances* when in a state of uncertainty whether it will be able to sustain itself, depending on favorable or unfavorable contingencies, which in the course of business may occur, and over which its officers have no control." [2 Morse on Banks and Banking, p. 1034.] This definition of Morse of "in failing circumstances" is somewhat different from the definition given in Corpus Juris. [See 32 C. J., p. 309.] But the definition given by Morse seems to be one that would be adopted by the Supreme Court of this State. [See State v. Buck, 120 Mo. 479, 494.] In the Buck case the phrase "in failing circumstances" is treated as not amounting to insolvency. It has been

held that a request for extension of time on the part of a debtor for the payment of his debts is evidence of insolvency. [Moore v. Carr, 65 Mo. App. 65, 70, 71; Oliver-Finnie Grocer Co. v. Miller, 53 Mo. App. 107, 110.]

It will be seen that an excess of assets over the liabilities does not necessarily show that one is not insolvent. The fact, if it be a fact, that the capital stock, surplus, undivided profits and guarantee fund of the bank amounted to $31,029.84 more than the loss on the real estate security, does not necessarily determine the question. The fact of the matter is that in addition to these nineteen heavy borrowers who owed the bank in excess of $247,000. at the time the bank closed, we find other indebtedness had been renewed on account of the inability to collect the same (the evidence shows that the bank was making an effort to collect all its loans as they became due), bringing up the amount of loans not collectible as they fell due to a sum in excess of $272,000. In fact the inference is strong that practically all the loans were not collectible as they fell due. The report of the Bank Examiner shows that all the loans secured by real estate mortgages made by the bank were in practically the same condition. After mentioning several of the large loans the report says—

"Balance are small, but are all of the same class of loans as these listed above. Practically all are second or third and some of them fourth deeds of trust. Believe also in some instances at least the land is valued at a high figure under present conditions."

Defendants base the loss of only $116,000 on the supposition that the market value of the real estate security was high enough that the loss would be no greater than this, but this calculation is based upon the theory that the amount of the second and subsequent mortgages exceeded by only $116,000 the equity in the real estate above the first mortgages based on the actual market value of the land. There was evidence tending to show that there was practically no market for real estate during and about the time these deposits sued for were made.

As to the personal financial responsibility of the signers of the notes, it is not necessary for us to determine whether these borrowers were in fact insolvent. Under the definitions of insolvency, supra, it would seem that they were, but it is not necessary for us to so hold. In determining whether the bank at any specific time was insolvent we look to see if it was able to meet its obligations as they matured in the usual course of business and whether it was so able to meet them would not depend so much upon the insolvency of its borrowers as the availability of its assets to meet matured and maturing demands against it. The assets represented by the notes of these borrowers were not available. These debtors were unable

to pay their loans and required renewals from time to time without payment even of interest in most instances. Foreclosure of the deeds of trust would have resulted in a great loss, much greater than the $116,000 that defendants say the evidence shows is the deficiency in the amount of the real estate security.

However, there is some plausibility in defendants' argument that although the bank had $150,000 that had been borrowed from city banks falling due in the summer of 1921 and it did not have money on hand or assets that could have at once been converted into money to meet this indebtedness, these facts would not make the bank insolvent as the directors had every reason to expect that the payment of these debts would not be demanded and knew that it had credit or ability to borrow the money to meet its obligations as they matured. In this connection the evidence shows that the cashier on July 14, 1921, ascertained that money could be borrowed from the city banks and that the notes would be renewed and, in fact, the evidence shows that they were renewed when they fell due. There is nothing in the record to show under what circumstances the cashier obtained the consent of the city banks to a renewal of the loans made by them to the Milan State Bank. Director Higgins, being the only director or officer of the bank who testified, stated that the cashier reported "the banks would furnish the money if *absolutely necessary;* but was not paying out anything for speculative purposes; not to be used unless it was necessary."

But between July 14 and the time the bank suspended, real estate continued to decrease in value and the deposits of the bank fell off. The general condition of the bank grew worse. It was gradually going down from the time it opened for business. We are forced to the conclusion that the only reason the city banks renewed the notes that fell due in August, September and October, amounting to $138,000 and constituting all the bills payable of the bank, was because they were unable to make collection upon the notes or were ignorant of the bank's true condition. These banks were apparently renewing these loans for the same reason that the Milan State Bank renewed loans to its depositors. It may be inferred from the evidence that the true condition of the bank was well known to the directors, and the evidence is such that the jury could find it would have been known to any reasonable man in their position from the time the first deposit sued for was made. At the time the loans were renewed and during all the time the deposits sued for were made, the bank had an excess of $272,000 in loans which appeared to be uncollectible unless in the indefinite future, and knew that its loans could not be collected immediately without great sacrifice in the security and that after the process of collection had been finished, if undertaken, the bank's liabilities

would have enormously exceeded its assets. The undesirability of attempting to foreclose the mortgages under the circumstances was recognized not only by the officers of the State but by the directors themselves.

There is no question but that the bank was unable to meet its bills payable as they fell due. Renewing its bills payable under the circumstances above described would not be meeting its obligations as in the usual course of business. The jury could well find that the bank having at least $272,000 in frozen loans, insufficiently secured, out of total loans of $322,000 and resources of $372,000 would not be able to renew its loans with the city banks if those banks were able to make collection upon the indebtedness due them. As before stated, the city banks either renewed the loans because they could not collect them or were ignorant of the true situation. In the former case under the authorities, supra, the bank was insolvent and we think the same condition obtains if the latter case were true.

We would hesitate to hold that a bank, being operated under ordinary conditions, that is, with its loans in reasonably good condition and having the confidence of its depositors (the evidence in this case showing that the deposits were rapidly declining about the time in question) and having reason to believe that its bills payable would be renewed at maturity and with the ability to have on hand sufficient cash to meet the legal reserve, is presently insolvent merely because all of its bills payable are to become due in a period of ninety days and it would not be in a condition to meet them at once if payment should be demanded. But the bank in question was not in this situation. It was in an extremely shaky condition during the time the deposits were made. The guaranty fund was in no better condition than the other funds of the bank. It never represented cash but was involved in doubtful loans as were the other assets of the bank. The assets were decreasing at the rate of about $12,000 per month; its deposits were decreasing at the rate of about $10,000 per month while its bills payable and bills rediscounted were decreasing at the rate of only about $656 per month; nineteen borrowers owed the bank approximately $247,-000 insufficiently secured; over $100,000 of the bank's loans were not secured in any manner; the loans of five of these nineteen borrowers were in excess of the amount allowed by law; there was $60,000 past due indebtedness; nearly $43,000 of indebtedness had been charged off because not collectible during that time. Day after day the bank did not have on hand its legal reserve; •from June 1 to October 13, 1921, a little over $54,000 of the bank's loans were charged off and taken out of the assets of the bank and at the time the bank closed its assets had been reduced to $372,000; its deposits

from June 11, 1921, to October 13 had decreased nearly $80,000. Practically all of the large loans appeared to be in a bad condition; only a small percentage was secured by first-class security; practically all of these loans had to be renewed when they fell due and little of the interest could be collected. There were other unfavorable conditions as shown in our statement of the facts.

The jury could well say that had the city banks known of the condition above described they would not have renewed the indebtedness if it could have been collected much less advance new money, and if they were ignorant of these facts, then the directors had no right to presume that the indebtedness would be renewed or new money advanced for the reason that as soon as the city banks obtained an inkling of the true state of affairs, which might occur at any time, they would refuse to voluntarily renew the notes of the bank. The fact is the city banks must have found out the true condition of the bank between July 14 and October 10th, otherwise why did they decline to loan new money on the latter date when they had agreed to do so on the former in case the loan of money became necessary? If it be contended that the city banks refused to advance money because the condition of the bank changed for the worse in the *interim,* then it could be said that the directors knew that this change (which was not great but merely a continued gradual decline) would inevitably take place under the circumstances and had no reason to believe that the city banks, in the usual course of business, would advance new money when the changed condition was at hand. In other words, the directors knew when the deposits sued for were made that the bank could not meet their bills payable in the usual way. We think under any definition of the word "insolvency" the bank was in that condition at the time these deposits were made; that it was in failing circumstances is apparent. The jury could well find that under the circumstances it was inevitable that the bank would not be able to sustain itself.

Much is said concerning what the Bank Examiner and Commissioner of Finance thought of the bank during this period of time. Of course, it was the duty of the Commissioner of Finance to have closed this bank under the law in case at any time it became insolvent, but he did not close the bank and, therefore, it is argued that he thought the bank was not insolvent. What the Bank Examiner or the Commissioner of Finance thought about the situation is not controlling. The statute does not provide immunity on the part of the directors who accept deposits with knowledge of the fact that a bank is insolvent or in failing circumstances, because the Commissioner of Finance permits the bank to continue even with knowledge of all the circumstances. The statements of the

Bank Examiner show that this bank was being shown great leniency (perhaps too great) on account of the fact that it was organized at the instigation of the representatives of the Banking Department of the State. We are not called upon to defend or criticise the banking department for permitting this bank to continue in operation. Of course, the state authorities could not have had as much information as to the true condition of the loans of the bank (although the record shows the Bank Examiner had a great deal) as did the directors who were in active and continuous charge of the bank's affairs. While the Bank Examiner knew that real estate values were decreasing, he may not have known of the extent of the decrease in the value of the particular tracts of land or had as definite knowledge of the true situation as the directors. He may have largely relied upon information furnished him by the officers of the bank as to local conditions. But, regardless of the failure of the Commissioner of Finance to act, we think there is no question but that there was ample evidence from which the jury could say that the bank was in failing circumstances at the time the deposits sued for were made.

We are not impressed with the argument that the defendants, the directors of the bank, did not know of the condition of the bank. Only one of them took the stand. It is admitted that the directors were familiar with the business of the bank and it is conceded that they are not attempting to escape liability on the ground that they were not familiar with its affairs. Of course, the knowledge provided for in the statute is actual knowledge but such knowledge like any other fact may be inferred from the facts and circumstances. [Speer v. Burlingame, 61 Mo. App. 75, 87.] The directors being thoroughly familiar with the affairs of the bank must have known of its true condition. In this connection the jury was at liberty to give what weight it saw fit to the fact that the Commissioner of Finance permitted the bank to continue in operation, also to the action of some of the members of the Board of Directors in reference to depositing their money in other banks and the condition of their accounts and loans with the bank at the time it closed.

It is insisted that the petition did not state a cause of action and that the court erred in overruling defendants' demurrer thereto; that the suit should have been brought by the Commissioner of Finance and not by the depositors in person. There is no merit in this contention. [Cummings v. Winn, 89 Mo. 51; Eads v. Orcutt, supra.] The suit which the Bank Commissioner is authorized to bring in section 11724, Revised Statutes 1919, is for creditors generally.

Complaint is made of the court's instruction No. 2, which instruction tells the jury that it is admitted that plaintiffs had on deposit in the bank, prior to the time the deposits sued for were made, the sum of $268.75 and "that checks thereafter drawn by plaintiff should be considered applied as repayment of said sum of $268.75 before being applied as repayment of any deposits that may have been made at later dates." Defendants argue, in effect, that the continued operation of the bank permitted plaintiffs to make withdrawals so defendants should be credited with their amount and the withdrawals should not be charged against the amount of deposits made prior to June 11th, which was the date on which the first deposit sued for was made. The statute (section 11763) provides that "every person violating the provisions of this section shall be individually responsible as to the depositor for such deposit so received." It has been held that this statute is remedial as to the depositor but is penal as to the officer of the bank and fixed a punishment upon the latter for his transgression, in making him pay the debt of the bank. [Eads v. Orcutt, supra.] If the contention of defendants were allowed, they would be permitted to take advantage of their own wrong. The directors ought not to be permitted to offset the withdrawals against the amount of the deposits sued for when to do so would prevent the depositors from recovering the full amount allowed by the statute. The statute provides a cause of action for *deposits* made and says nothing about any credit. The reception of the *deposit* gives rise to the penalty imposed by the statute, that is the basis of the cause of action. The depositor is entitled to recover all of the deposits he has made under the circumstances but, of course, he is not permitted to recover a greater sum than he has been damaged. That is to say, if a depositor has in the bank a balance of $1,000 before it becomes insolvent with knowledge of the officer sued and thereafter deposits $5,000 and withdraws $4,000, he cannot recover $5,000 but only $2,000.

Complainant is made of plaintiffs' instruction No. 4, which is as follows:

"The court instructs the jury that if you believe and find from the evidence that plaintiffs made the alleged deposits and that at the time said bank was insolvent or in failing circumstances, and that the defendants were directors thereof, then defendants are presumed to have known that said bank was insolvent or in failing circumstances and to have assented to the reception of such deposits, and if you find the facts to be as aforesaid the burden passes to defendants to show that they did not have knowledge that said bank was insolvent or in failing circumstances or did not assent to the reception of such deposits."

There is no contention that section .11764 does not make the fact of insolvency or failing circumstances of the bank at the time the deposits were received prima-facie evidence of the knowledge of such insolvency or failing circumstances by the directors, for it does. But it is claimed that the instruction has the jury "understand that the evidence to rebut the presumption of knowledge must come from the defendants" and that they are not to consider the evidence of plaintiffs to show lack of knowledge. There is no merit in this contention. The instruction is merely on the subject of burden of proof and standing by itself is proper in that connection. [See Speer v. Burlingame, supra, 1. c. 90, 91.] However, in defendants' instruction No. 3 the jury were told that if they find and believe *"from the evidence in this case* that at the time the deposits were made" the bank "was insolvent or in failing circumstances, but *that defendants had no knowledge that said bank was insolvent or in failing circumstances,* then you should find for the defendants." (Italics ours.)

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.