SARAH E. AKIN, ADMINISTRATRIX, RESPONDENT, v. CHARLES V. HULL ET AL., APPELLANTS.*

Kansas City Court of Appeals. June 11, 1928.

*Corpus Juris-Cyc References: Banks and Banking, 7CJ, section 169, p. 564, n. 30; section 187, p. 573, n. 61; section 482, p. 727, n. 7; Trial, 38Cyc, p. 1591, n. 54.

*Gresham & Gresham* and *Sterling P. Reynolds* for respondent.

*James H. Hull* and *German, Hull & German* for appellants.

WILLIAMS, C.—This case comes to us on appeal from the Platte county circuit court, and is a suit by the administratrix of the estate of Frank J. Akin, deceased.

The petition alleges that plaintiff had deposited in January and February and the following months of 1923, certain funds in the bank of Dearborn, to-wit:

Jan. 15, 1923, $548.75; Jan. 17, 1923, $5.35;
Jan. 19, 1923, $257.56; Jan. 24, 1923, $8010.61;
Jan. 24, 1923, $ 8.67; Feb. 2, 1923, 30 cents;
Feb. 3, 1923, $ 6.78; Sept. 11, 1923, $72.60.

It is alleged that at the times that the bank was insolvent, or in a failing condition, and that defendants, as directors, knew the bank's condition. Plaintiff prayed judgment for the amount of her deposits. The case was tried before a jury and verdict was returned in favor of plaintiff for $5993.66.

After an unsuccessful motion for a new trial and motion in arrest of judgment, the defendants appeal.

The evidence shows that the respondent, Sarah E. Akin, Administratrix, was a depositor in the bank of Dearborn. The bank of Dearborn was located at Dearborn, Platte county, Missouri, and had been

in business many years prior to the time it was taken in charge by the State Finance Commissioner on the 9th day of March, 1922. This bank was re-organized. The State Finance Department charged out several thousand dollars which was replaced with what was considered solvent live assets. In the reorganization, the defendants herein, were elected as a board of directors. The bank was operated until October 1, 1923, at which time the bank was again placed in the hands of the State Finance Commissioner.

It seems that on September 30, 1923, unusual heavy withdrawals were made by the depositors. This reduced the reserve of the bank below that which was required by law.

A meeting of the directors was called on the 30th day of September, a report was made and it was decided that the bank should suspend operations and the finance department be notified.

The evidence will be noticed more in detail in the course of the opinion.

The first question presented by the appellant is that the Finance Commissioner is the only party to institute this action. This question was decided adversely to appellant's contention in the recent case of White v. Poole, 272 S. W. 1021, and again more recently by the Supreme Court in the case of Mary E. Ivie v. John S. Bailey et al., 5 S. W. (N. S.) 50. This point is therefore decided against the appellant.

The next two points are that the plaintiff failed to prove that the bank was insolvent or in a failing condition within the knowledge of the defendants.

Over $60,000 of the notes were more than thirty days past due in July, 1923, with the bank still a going concern and meeting its obligations.

The Supreme Court in State v. Walser, 1 S. W. (N. S.) 147, l. c. 150, said:

"Witnesses for the State were permitted to testify that they had not collected certain notes belonging to the bank. This testimony was erroneously admitted because there was no showing upon the part of the witnesses that they had made a sufficient effort to collect these notes. The evidence went no further than tending to show that some of the notes had been sent to an attorney for collection. The issue on which defendant was tried was the insolvency of the bank and defendant's knowledge of it at the time of the deposit. It was necessary for the State to develop probative evidence as to both these facts. The fact that notes were not collected does not tend to show that they could not be collected without showing as to the effort made to collect them."

The notes spoken of by the court must have been past due before collection was attempted. In the present case, no evidence was in-

troduced tending to show what efforts were made to collect. We do not think the mere statement that, "I could not collect," meets the requirement as laid down in State v. Walser, supra. Again the showing of uncollectibility must not be as of the time of the closing of the bank, but must be shown as approximately of the time of the reception of the deposits. [State v. Sanford, 297 S. W. 73.] It is well known, and is shown in evidence, that a man may be able to pay today and within a short time be unable to meet his obligations. Under the above authority, the mere showing of past due paper is no evidence of insolvency.

More specifically the evidence shows:

That the note of one Shannon was good when made but has since turned out bad. This loan was in the bank at the time the deposits were made and was considered good at that time. When the directors learned that this note was bad is not shown. Actual knowledge is necessary as was said in White v. Poole, supra, l. c. 1027-1028.

"Of course, the knowledge provided for in the statute is actual knowledge, but such knowledge, like any other fact, may be inferred from the facts and circumstances."

In view of the testimony we do not think the directors could be charged with actual knowledge that the C. E. Shaw note was bad at the time the deposits were made. This note amounted, after the charge off on reorganization, to $1588.

Thomas Adams owed a note of $600. This note seems to have been paid.

D. E. and Joseph Nichols had notes for $5000 and $2000. These notes were secured by real estate. The real estate was foreclosed and some question arose as to the title. The evidence showed that the makers owned around ninety acres of land worth about $100 per acre. The bank owned this land under the foreclosure unless the title is bad. The directors knew nothing of this question as to the title of the land and had a right to assume that this title was good.

A. B. Dean owed notes of $900 and $800. There seems to have been a $1007 loss on these notes.

Ed. C. Smith had a note for $17,000 secured by 290 acres of land. $7500 was lost. The evidence would justify the directors in believing this note was good when made, and no knowledge that this note was not good is brought home to the directors, as of the time the deposits sued for, were made.

Henry Day owed a note of $1703. Some money had been collected on it. It was in the hands of attorneys. The evidence does not show the amount collected nor the attempts that were made to collect.

Kathryn Bywaters owed a note of $2000. There is no evidence tending to show whether or not this note was bad at the time the deposits were made.

J. D. Doyle or "Coyle," owed a note for $317.55. This note seems to have been good by endorsement.

E. P. Duncan owed a note of $1822.70 which had been reduced from $3462.70.

Thomas H. Thompson's note of $1245.39 had been paid by the foreclosure on land.

Jesse L. Shortridge's note of $4289.74 had been partly paid but did not show how much.

Sarah E. Akin, plaintiff in this suit, is the widow of Frank J. Akin who owed the bank a note. She testified that she had on deposit. as administratrix, $5294.79. It seems as if this deposit would make this note good.

M. D. Rose's note of $283 seems to have been paid.

One of the tests of solvency is the excess of assets over liabilities. This evidence does not show insolvency under the rule in White v. Poole, supra.

It is argued that the West report of April 6, 1922, should be the basis. The deposits, it will be noted, were made in January of 1923. Under the authority of State v. Walser, supra, the mere fact that the notes were not paid when due, or were not collected, is not sufficient, but the efforts, if any, to collect the notes must be shown.

A banker testified, which is within the common knowledge of all people, that it was not possible for a banker or director to always determine the insolvency or solvency of a borrower. A man might be good today and lose his money over night, especially was that true in 1923 with land values going down, deposits falling off and every one selling live stock.

Insolvency is thus defined in the case of White v. Poole, supra, l. c. 1025:

"Insolvency, as applied to banks, is defined as 'inability to pay its debts in the usual and ordinary course of business.' [State v. Burlingame, 146 Mo. 207, 48 S. W. 72; State v. Darrah, 152 Mo. 522, 54 S. W. 226; Mitchell v. Bradstreet Co., 116 Mo. 226, 240, 22 S. W. 358, 724, 20 L. R. A. 138, 38 Am. St. Rep. 592.]

" 'Solvency implies as well the present ability of the debtor to pay out of his estate all his debts, as also such condition of his property as that it may be reached and subjected by process of law, without his consent, to the payment of such debts. . . . A person may be insolvent, although he may be able to pay his debts at some future time on a settlement and winding up of his affairs.' [14 R. C. L., pp. 628, 629.]

" 'An ability to pay in the future, or an excess of assets over liabilities, without a present ability to pay debts as they become due in the usual course of business, was not solvency,' [Eads v. Orcutt, 79 Mo. App. 511, 524.]

" 'Insolvency is that condition of affairs in which a merchant or business man is unable to meet his obligations as they mature in the usual course of business.' [2 Morse on Banks and Banking, p. 1035.]

"Insolvency is frequently defined as 'inability to make payments as usual, or as they mature, or according to the undertaking, or in the ordinary course of business.' [Stone v. Dodge, 96 Mich. 514, 524, 56 N. W. 75, 78, 272 S. W. 65, 21 L. R. A. 280.] The stopping of payments on the part of a bank is evidence sufficient within itself of the insolvency of the bank 'and when there is nothing to rebut the presumption the evidence of insolvency is conclusive.' [Stone v. Dodge, supra.] . . .

" 'A bank is in failing circumstances when in a state of uncertainty whether it will be able to sustain itself, depending on favorable or unfavorable contingencies, which in the course of business may occur, and over which its officers have no control.' [2 Morse on Banks and Banking, p. 1034.]

"This definition of Morse of 'in failing circumstances' is somewhat different from the definition given in Corpus Juris (32 C. J., p. 309). But the definition given by Morse seems to be one that would be adopted by the Supreme Court of this State. [State v. Buck, 120 Mo. 479, 494, 25 S. W. 573, 577.] In the Buck case the phrase 'in failing circumstances' is treated as not amounting to insolvency. It has been held that a request for extension of time on the part of a debtor for the payment of his debts is evidence of insolvency. [Moore v. Carr, 65 Mo. App. 65, 70, 71; Oliver-Finnie Grocer Co. v. Miller, 53 Mo. App. 107, 110.]"

Section 11764, Revised Statutes 1919, makes the going into the hands of the Finance Commissioner prima-facie evidence of insolvency, or failing circumstances of the bank, at the time; and makes this prima-facie knowledge, on the part of the directors, of this condition. This is but a presumption and is not conclusive. [Swoboda v. Nowak, 213 Mo. App. 452, l. c. 465; Prentiss v. Illinois Life Ins. Co., 225 S. W. 695.]

In the reply brief it is urged that as defendants joined in submitting the issues to the jury, that they cannot now raise the question that the demurrer should have been sustained. However, the defendants first asked a peremptory instruction which takes this case out of the rule laid down in the authorities cited by respondent. [Wolfe v. Stark Bros. Nurseries & Orchards Co., 288 S. W. 1004; Sabol v. St. Louis Cooperage Co., 282 S. W. 425.]

In this instance, the directors bought stock in the bank and had their own money in the bank; every act showed their utmost good faith. Directors were not insurers of the deposits. The statute in question, has in it the idea of fraud. The bank met its debts in the

usual and ordinary course of business long after the deposits in question were made. The bank only suspended by reason of its reserve being low and not by reason of its inability to pay its debts.

As said in the case of State v. Sanford, 297 S. W. 73, l. c. 78:

"Manifestly, and in common justice, appellant was not chargeable at that time with knowledge of the financial condition of the bank as it appeared in the light of later events and subsequent investigation. His culpability in assenting to the reception of the deposit must be measured by what he knew or reasonably should have known concerning the solvency of the bank when the deposit was accepted. . . .

"The position of an officer of a state bank with respect to the reception of deposits is not an enviable one whenever there is any question of the impairment of the assets of his bank. If there is any possibility that his bank may subsequently be deemed insolvent, through its failure to realize on assets whose immediate value is affected by temporary conditions, acceptance of deposits is perilous because the statute makes the subsequent failure prima-facie evidence of his knowledge of such insolvency. If, out of abundance of caution, he refuses to accept a deposit, he may just as well call his board of directors together and send for the commissioner of finance to come and take charge of his bank. Such course might cause unnecessary loss to other depositors and his stockholders. He is torn between fear of the penitentiary and duty to his bank and its depositors. In such situation, the bank official cannot justly be held chargeable with the exact knowledge of his bank's condition which a fair and distinterested bank examiner might acquire by carefully going over the assets and liabilities of the bank. Certainly such officer cannot be held to the same knowledge of the exact condition which is disclosed to the liquidating officer who only comes on the scene after disaster has overtaken the bank.

Here the evidence offered by appellant tended to show that he had complete confidence in the ultimate solvency of his bank. Every dollar he had, and even the home he had given to his wife, were sacrificed in an attempt to make good such confidence. Most of appellant's fortune, whether or not it was as large as he thought it was is immaterial, was tied up with the fortunes of the bank before it was turned over to the commissioner of finance. That constituted the strongest sort of evidence of his belief in the solvency of his bank. Whether he was justified in his belief or not is beside the question. The test fixed by the statute is knowledge of insolvency or knowledge that his bank is in failing circumstances at the time he assented to the reception of the deposit."

This language, used in connection with the active president, applies with equal force to these defendants

We do not think, under the evidence in this record, plaintiff was entitled to go to the jury upon the question of insolvency of the bank at the time the deposits were received, or that the defendants had knowledge of the insolvency, if in fact, the bank was insolvent at that time.

The judgment is reversed and the cause remanded. *Frank, C.,* concurs.

PER CURIAM:—The foregoing opinion by WILLIAMS, C., is adopted as the opinion of the court. *Bland* and *Arnold, JJ.,* concur; *Trimble, P. J.,* absent.