**BYRD v. ROSS et al. (two cases).**
Nos. 734, 733.

District Court, S. D. Florida, Jacksonville
Division.
April 15, 1932.

A. P. Rivers and J. B. Hodges, both of Lake City, Fla., for plaintiffs.

John F. Harrell, of Live Oak, Fla., and Doggett, McCollum, Howell & Doggett, of Jacksonville, Fla., for defendants.

STRUM, District Judge.

These are companion suits in equity, in which plaintiffs assert that First National Bank of Jasper fraudulently accepted general deposits from plaintiffs when said bank was known by its officers to be hopelessly insolvent. Because of such alleged fraud on the part of the bank, plaintiffs seek to rescind their contracts of deposit and recover their deposits in full from the receiver upon the theory that the bank became a trustee ex maleficio.

The facts in the two cases are parallel, it being stipulated that all evidence offered by the parties shall be considered in both cases as far as it is applicable.

J. D. Byrd, one of the plaintiffs, testified that on April 22, 1930, he had a conversation with P. H. Sandlin, president of the bank, as a result of which, and on account of the statements then made to him by the president, plaintiff on that date deposited certain moneys in the bank. Mr. Byrd's version of the conversation is: "I (Byrd) asked him the condition of the bank and he said it was in better condition today than it ever has been; there is more money in it today than ever has been since the bank has been organized; that there is plenty in here to pay depositors every cent today if they were to call for it; that the bank is in good shape and that I would be 'plum safe' to deposit with the bank." To this Mr. Byrd testifies he replied he was glad to hear it, and that if the bank "is in that good shape, I will leave some (money) with you for a while."

Miss N. A. Byrd testified that a few days prior to April 22d she met Mr. Sandlin on the street and they discussed the possibility of Miss Byrd accepting a position in the bank, Miss Byrd expressing a doubt as to the then soundness of banks generally. During the course of such conversation Mr. Sandlin stated: "We have got a great little bank right here in Jasper; why don't you put your money over here with us? There is more money in this bank now than has ever been before." Miss Byrd then inquired whether Mr. Sandlin thought the bank was in better condition than it had been, to which Mr. Sandlin replied: "Yes, I really have more money in the bank than we ought to keep here; we will be glad if you deposit

your money with us." To which Miss Byrd replied: "Well, I'll think about it."

During the morning of April 22, 1930, both Mr. Byrd and Miss Byrd made deposits of cash in the bank, which are here sought to be recovered. The bank remained open that day and the next day, but did not open for business on the morning of April 24, 1930.

Both the plaintiffs testified that they made their deposits because of Mr. Sandl.n's statements quoted, and J. D. Byrd, for the further reason that he had heard that the Commercial Bank, another bank in the same city, was "going to the bad," and he had withdrawn his money from it. This other bank closed on April 22, 1930. At the time Miss N. A. Byrd made her deposit, J. D. Byrd had not told her of his conversation with Sandlin, Miss Byrd testifying that she made her deposit for the reason that Mr. Sandlin had been president of this bank so long that she felt that he would "keep it good, if possible."

Mr. Sandlin, president of the bank, testified that he did not solicit the deposits from J. D. Byrd; that in his conversation with J. D. Byrd nothing was said with reference to the solvency of the bank; that he (Sandlin) did not know at the time of the deposits that the bank was insolvent, and that, had he known it, he would not have accepted the deposits. He then believed that the bank was solvent and able to take care of its depositors; that the First National refused to open its doors on the morning of April 24th, in order "to take care of its depositors," at which time Sandlin thought there was enough money for that purpose, and that after the Commercial Bank closed he "thought we were all right, right on."

A short while before the closing, the Comptroller had required the First National to remove from its assets $19,000 in doubtful bills receivable. The officers of the bank had voluntarily assessed themselves $12,000 to offset this loss, at least a part of which assessment had been paid into the bank, but how much does not appear.

Mr. Sandlin also testified that the Jasper Bank had "arranged" with the Federal Reserve Bank, of which the Jasper Bank was a member, to assist the Jasper Bank to the extent of $25,000; and that, on the day the Commercial Bank closed, the First National sent a circular letter to all depositors of the First National stating, in effect, that the latter bank was able "to cope with the situation," and further requesting its depositors to remain calm. When the First National closed it had on hand cash in the sum of $8,027.90.

In cases of this character, the burden is upon the plaintiffs to show that actual fraud was practiced upon them. There must be affirmative proof of the bank's actual and hopeless insolvency when it received the deposit, and also that its managing officers had actual knowledge that such was the case, although proof of an actual intent to defraud is unnecessary. Fidelity & Deposit Co. v. Kelso State Bank (C. C. A.) 287 F. 828; St. Louis & S. F. Ry. Co. v. Johnston, 133 U. S. 566, 10 S. Ct. 390, 33 L. Ed. 683.

Banks, inviting and receiving as they do a high degree of confidence, are held to rigid responsibility for good faith and honest dealing. Acceptance of deposits by a bank is ordinarily a representation of solvency. A bank which is, to the knowledge of its managing officers, hopelessly and irretrievably insolvent, cannot honestly continue its business and continue to receive the moneys of its depositors. Although the bank's officers entertain no actual intent to defraud, nevertheless, when they know that the bank is hopelessly and irretrievably insolvent and receive money deposits on the eve of its failure, they commit a fraud on a depositor who, in ignorance of the condition of the bank, deposits his money therein. In these circumstances persons who have deposited money may rescind for fraud and reclaim the deposit or its proceeds, if traced into the assets of the bank coming into the hands of the receiver. Richardson v. New Orleans Debenture Redemption Co. (C. C. A. 5) 102 F. 780, 52 L. R. A. 67; Holloway v. Dykes (D. C.) 29 F.(2d) 430; St. Louis & S. F. Ry. Co. v. Johnston, supra; Washington Shoe Mfg. Co. v. Duke, 126 Wash. 510, 218 P. 232, 37 A. L. R. 611; Steele v. Commissioner of Banks, Allen, 240 Mass. 394, 134 N. E. 401, 20 A. L. R. 1203.

On the other hand, mere embarrassed circumstances, or even simple insolvency of a bank at the time of receiving a deposit, without more, does not warrant the rescission, for fraud, of the contract of deposit, if, when the deposit was accepted, there was a present genuine and reasonably founded hope, expectation, and intention on the part of the bank's officers to carry on the business. To entitle a general depositor to rescission for fraud of this character, it must be reasonably apparent to the bank's officers at the time the deposit is accepted that the bank will presently be unable to meet its obligations as they mature, and will likely be obliged to

suspend. Moreover, this must usually be actual, not mere imputed, knowledge. An honest and reasonable mistake as to the condition of the bank, or an honest and reasonably founded opinion that the institution is solvent, or that it will be able to continue in business, negatives the existence of fraud, upon which the general depositor's cause of action depends. See the cases above cited. Also, Brennan v. Tillinghast (C. C. A.) 201 F. 609; Quin v. Earle (C. C.) 95 F. 728; Raynor v. Scandinavian-American Bank, 122 Wash. 150, 210 P. 499, 25 A. L. R. 716; Florida Bank & Trust Co. v. Yaffey (Fla.) 136 So. 399.

This bank continued in its usual business on the day of these deposits, and throughout the next day, remaining closed on the morning of the third day in order, according to its president, "to protect the depositors." As the court judicially knows that Jasper is a relatively small town, and as the undisputed evidence shows that another bank in the same town closed its doors on April 22, 1930, the defendant bank's refusal to open on April 24th may be consistently regarded as an act of prudence, rather than a badge of fraud, there being no showing to the contrary. State v. Tunnicliffe, 98 Fla. 731, 124 So. 279.

■■ The only facts in evidence which might be urged as having any tendency to support the plaintiff's charge of fraud are the suspension of the bank on the second day after these deposits were made, and that there was then on hand cash in amount of only about $8,000. For a small bank, this amount of cash in the vault when the bank suspended would not alone indicate hopeless insolvency two days before. What other "cash items"—usually regarded as the equivalent of cash—were on hand, does not appear. Nor is there any proof as to the amount of cash the defendant bank had on deposit in other banks. Though a bank be regarded as insolvent when it is unable to meet its obligations in the usual course of business, the amount, character, and value of its assets, and the amount and character of its liabilities are matters quite pertinent, if not indispensable, to the question of "hopeless and irretrievable" insolvency. Akin v. Hull, 222 Mo. App. 1022, 9 S.W.(2d) 688. In this case there is utterly no evidence as to the amount or value of the bank's assets, the amount of its liabilities, nor as to the character and soundness of its investments, either on April 22d or at any other time, other than the items of $19.000, and the cash on hand, as above mentioned.

It affirmatively appears that at least some new money had recently been put into the bank by its stockholders. All the directors of the bank—in good faith for aught shown to the contrary by the evidence—united in a written assurance to the bank's depositors on April 22d that the bank could "cope with the situation"; and it affirmatively appears that the bank had arranged for a $25,000 line of assistance with the Federal Reserve Bank. Why this assistance was not utilized is left to conjecture. Although, from the depositor's point of view, subsequent events might be interpreted to indicate a precarious condition on April 22d, certainly the evidence does not preponderantly disclose the existence of "hopeless and irretrievable" insolvency on the part of the bank and actual knowledge thereof by its managing officers on that date.

A decree will therefore be entered dismissing the bill in each case, at the cost of the respective plaintiffs.